**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**LEAGUE OF WOMEN VOTERS OF LOUISIANA, ET AL.**

**VERSUS**

**NANCY LANDRY, ET AL.**

**CIVIL ACTION**

**NO. 25-413-JWD-SDJ**

# RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss Plaintiffs' Amended Complaint* ("*MTD*") (Doc. 86) filed by Defendants Nancy Landry, David Matlock, Bruce Greenstein, Cade Brumley, Susana Schowen, Misti Cordell, and Charlene Meaux Menard (collectively, "Defendants"). Plaintiffs League of Women Voters of Louisiana and League of Women Voters Education Fund, Voice of the Experienced, National Association for the Advancement of Colored People Louisiana State Conference, and Power Coalition for Equity and Justice (collectively, "Plaintiffs") oppose the motion. (Doc. 91.) Defendants have filed a reply. (Doc. 99; *see also* Doc. 103 (notifying the Court of a related lawsuit filed in the United States District Court for the Western District of Louisiana).) Plaintiffs have filed a sur-reply. (Doc. 109.)

Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Court will GRANT IN PART and DENY IN PART Defendants' *MTD*.

## TABLE OF CONTENTS

I. Relevant Background .......... 2
A. NVRA & Act 500 .......... 3
B. Factual Background .......... 4
1. The Parties .......... 4
2. The Dispute .......... 6
3. Causes of Action .......... 10
4. Prayer for Relief .......... 11

C. Procedural Background ........ 11
II. Discussion ........ 12
A. Summary of Ruling ........ 12
B. MTD: Jurisdictional Challenges ........ 14
1. Rule 12(b)(1) Standard ........ 14
2. NVRA Notice Requirement ........ 15
3. Article III Standing ........ 22
4. Ripeness ........ 33
5. Sovereign Immunity ........ 38
C. MTD: Pleading Challenges ........ 45
1. Rule 12(b)(6) Standard ........ 45
2. Vagueness Claims ........ 46
3. Equal Protection Claims ........ 51
III. Leave to Amend ........ 60
IV. Conclusion ........ 62

## I. RELEVANT BACKGROUND

On December 10, 2025, League of Women Voters of Louisiana and League of Women Voters of Louisiana Education Fund (together "League"), Voice of the Experienced ("VOTE"), National Association for the Advancement of Colored People Louisiana State Conference ("Louisiana NAACP"), and Power Coalition for Equity and Justice ("Power Coalition") filed the *Amended Complaint for Declaratory and Injunctive Relief* ("*Amended Complaint*")[1] in the present action against Nancy Landry in her official capacity as Secretary of State, David N. Matlock in his official capacity as Secretary of the Department of Children & Family Services, Bruce D. Greenstein in his official capacity as Secretary of the Department of Health, Dr. Cade Brumley in his official capacity as Superintendent of Education for the Department of Education, Susana Schowen in her official capacity as Secretary of Louisiana Works, Misti S. Cordell in her official capacity as Chairwoman of the Board of Regents, and Charlene Meaux Menard in her official capacity as the Lafayette Parish Registrar of Voters. (Doc. 61.) This lawsuit concerns Act 500, an

[1] The initial complaint was filed on May 14, 2025. (*Compl.*, Doc. 1 at 1). The amended complaint added Meaux Menard as a defendant and Counts VI and VII (Violation of Equal Protection Charge) against Meaux Menard and Landry.

amendment to Louisiana's election code that requires documentary proof of United States citizenship with voter registration applications. Plaintiffs allege that the law's proof of citizenship requirement violates the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20505(a)(1)–(2), 20506, 20507(a)(1), and 20508(b), and the First and Fourteenth Amendments of the United States Constitution. (*Id.* at 46–55.)

**A. NVRA & Act 500**

The NVRA, 52 U.S.C. § 20501 *et seq.*, allows registration via a "mail voter registration application form" ("Federal Form") or a state-developed equivalent ("State Form"). *See* 52 U.S.C. § 20505(a)(1)–(2). The Federal Form includes state-specific instructions, which "must be approved" by the Election Assistance Commission ("EAC"). *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5–6 (2013) [hereinafter *ITCA*]. The Federal Form "does not require documentary evidence of citizenship," just attestation, "under penalty of perjury, that [the applicant] is a citizen." *Id.* at 4–5; *accord* 52 U.S.C. § 20508(b)(1)–(2). The State Form "may require information the Federal Form does not." *ITCA*, 570 U.S. at 12. But the State Form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess" an applicant's eligibility to register to vote. 52 U.S.C. § 20508(b)(1).

Recently, Louisiana's Act 500 amended Louisiana Revised Statutes § 18:104 to require applicants for voter registration to "include with [their] application[s] proof of United States citizenship."[2] *See* La. R.S. § 18:104(D)(2). "Louisiana was required to inform the EAC" of this change. (Doc. 46-1 at 2 (citing 11 C.F.R. § 9428.6(c)).) Louisiana (via Defendant Landry) therefore requested that the EAC approve revisions to the state-specific instructions included in the Federal Form. (*Id.* (citing Doc. 46-3 at 2).) As of January 8, 2026, the EAC has rejected the requested

[2] Act 500 was enacted on January 1, 2025. 2024 La. Sess. Law Serv. Act 500 (S.B. 436).

options to amend the state-specific instructions. (Doc. 91 at 9.) "The State is evaluating its options in light of that decision." (Doc. 86-1 at 13.) "[T]he Department of State has not provided guidance to state election officials to require voter registration applicants to submit proof of citizenship." (Doc. 89-1 at ¶ 23.) However, Lafayette Parish (via Defendant Meaux Menard) has already begun enforcing the documentary proof of citizenship requirement by asking at least one applicant for proof of citizenship. (Doc. 61 at ¶ 154; Doc. 61-4 at 2–3.)

## B. Factual Background[3]

### *1. The Parties*

There are seven parties involved in the motion before the Court: (1) League; (2) VOTE; (3) Louisiana NAACP; (4) Power Coalition; (5) Landry; (6) the State Defendants; and (7) Meaux Menard.

Plaintiff League is a "non-partisan, non-profit organization that seeks to encourage informed and active participation in government." (Doc. 61 at ¶ 11.) "League works to ensure that all eligible individuals have the opportunity and the information needed to register and vote, with a particular focus on traditionally underrepresented and underserved communities . . . including voters of color, first-time voters, low-income voters, newly naturalized citizens, young voters, and voters impacted by the criminal legal system." (*Id.* at ¶ 13.) Voter registration is League's "signature activity and core to its mission." (*Id.* at ¶ 15.) League's members include individuals across Louisiana who share in the organization's mission. (*Id.* at ¶ 14.)

[3] The following factual allegations come primarily from the *Amended Complaint* (Doc. 61) filed by Plaintiffs. For purposes of Defendants' *MTD*, the Court accepts as true Plaintiffs' well-pleaded factual allegations. *See, e.g.*, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (reciting the Rule 12(b)(1) standard); *Russell v. Choicepoint Servs., Inc.*, 302 F. Supp. 2d 654, 658 (E.D. La. 2004) (citing *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001)) ("Uncontroverted allegations . . . must be accepted as true."); *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (reciting the Rule 12(b)(6) standard).

Plaintiff VOTE "is a nonpartisan, grassroots nonprofit organization founded and operated by formally incarcerated people" that advocates on behalf of those formerly incarcerated in various areas including voting rights. (*Id.* at ¶ 30.) "VOTE conducts voter registration drives among the eligible population within jails . . . [and] outside of jails, including on college campuses." (*Id.* at ¶ 32.) VOTE's members "include U.S. citizens who were not born in the United States and are eligible to vote in Louisiana" and "individuals who are currently ineligible to vote but will become eligible and will need to provide proof of citizenship to comply with" Act 500. (*Id.* at ¶¶ 39–40.)

Plaintiff Louisiana NAACP "is the oldest and one of the most significant civil rights organizations in Louisiana, and it works to ensure the political, educational, social, and economic quality of African Americans and all other Americans." (*Id.* at ¶ 43.) "Louisiana NAACP regularly works to register and educate Black voters and encourages African Americans to engage in the political process by registering to vote and turning out to vote during election seasons." (*Id.* at ¶ 47.) "Louisiana NAACP's members include U.S. citizens who were not born in the United States and are eligible to vote in Louisiana." (*Id.* at ¶ 44.)

Plaintiff Power Coalition "is a non-partisan coalition of community-based organizations . . . [that] educates and empowers voters across" Louisiana. (*Id.* at ¶ 62.) "Power Coalition's work includes outreach to voters impacted by the criminal legal system in Louisiana, working with partners, including VOTE and the Louisiana NAACP, to provide voter education and engagement to eligible individuals with prior felony convictions, most of whom are Black Louisianans." (*Id.* at ¶ 64).

Defendant Landry is Louisiana's Secretary of State and chief election officer. (*Id.* at ¶ 77.) As Secretary of State, Landry is statutorily tasked with the duty to "administer the laws relating to custody of voting machines and voter registration . . . ." La. R.S. § 18:18(A).

The State Defendants include Matlock, Greenstein, Brumley, Schowen, and Cordell, who all administer public assistance programs subject to the requirements of Section 7 of the NVRA, 52 U.S.C. § 20506. (Doc. 61 at ¶¶ 78–82.)

Defendant Meaux Menard is the Lafayette Parish Registrar of Voters and the chief election official for Lafayette Parish. (*Id.* at ¶ 83.) As registrar she is responsible for voter registration and "for the administration and enforcement of the laws and the rules and regulations of the secretary of state." La. R.S. § 18:58.

***2. The Dispute***

Congress passed the NVRA, 52 U.S.C. § 20501 *et seq.*, to simplify voter registration by requiring no more than necessary from applicants to demonstrate their eligibility, while still protecting the integrity of elections. (Doc. 61 at ¶¶ 84, 86.) To achieve its goal of streamlining voter registration, the NVRA directs the EAC to create a "mail voter registration application form for elections for Federal office," 52 U.S.C. § 20508(a)(2), commonly known as the "Federal Form." (*Id.* at ¶ 87.) Congress stated that the Federal Form "may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." (*Id.* at ¶ 88 (quoting 52 U.S.C. § 20508(b)(1)).) States may develop their own voter registration forms—the "State Form"—but the State Form may also only require information that is "necessary" to assess applicant eligibility. (*Id.* at ¶ 92 (citing 52 U.S.C. § 20508(a)(2), (b)).)

Congress ultimately rejected proposals to allow states to require documentary proof of citizenship. (*Id.* at ¶ 93.) The EAC has never concluded that documentary proof of citizenship is

"necessary" and has consistently rejected requests to add such a requirement to the Federal Form. (*Id.* at ¶ 94 (citing *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014)).) No state has established that documentary proof of citizenship is "necessary" to justify requiring it on either the Federal Form or an NVRA-complaint State Form. (*Id.* at ¶ 95 (citing *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 719–20 (9th Cir. 2025) [hereinafter *Mi Familia Vota II*]).)

Louisiana has developed a State Form that voter registration applicants can use in addition to the Federal Form. (*Id.* at ¶ 101 (citing La. Stat. Ann. § 18:104).) Prior to Act 500, the State Form only required applicants to attest, under penalty of perjury, that they are a United States citizen. (*Id.* at ¶ 104 (citing La. Stat. Ann. § 18:104(C)).) Act 500 amended the election code to also require "each applicant [to] include with his application proof of United States citizenship." (*Id.* at ¶ 111 (quoting La. Stat. Ann. § 18:104(D)(2)).) Defendant Landry has not issued guidance on why proof is necessary, what proof would satisfy the law, how the proof must be submitted, whether the proof of citizenship requirement applies to all methods of registration, when the proof must be submitted, or the consequences for submitting an application without proof of citizenship. (*Id.* at ¶¶ 139–40.) Nor does the legislative history offer any answers to these questions. (*Id.* at ¶¶ 111–34.) Plaintiffs claim that because Defendant Landry has not explained why the proof is "necessary," Act 500 violates the attestation provision of Sections 6 and 9 of the NVRA, 52 U.S.C. §§ 20505(a)(1)–(2), 20508(b). (*Id.* at ¶¶ 208–16.) Plaintiffs also claim that Defendant Landry's failure to provide guidance on how to comply with Act 500 makes the law unconstitutionally vague in violation of Due Process and infringes upon a core First Amendment activity of voting. (*Id.* at ¶¶ 197–206.)

Despite the lack of guidance from Defendant Landry, at least one parish has enforced Act 500. (*Id.* at ¶ 154.) The Lafayette Parish Registrar of Voters Office asked a voter registration

applicant, who was born in Guatemala, to provide proof of citizenship "due to Senate Bill 436." (*Id.* at ¶¶ 154, 157; Doc. 49-2.) The Office explained that they "ask for a United States passport, Naturalization paper, or . . . birth certificate if [the applicants] were born abroad." (Doc. 49-2 at 2.) Plaintiffs claim this practice discriminates based on national origin in violation of the Fourteenth Amendment's Equal Protection Clause. (Doc. 61 at ¶¶ 154, 250.) The Office also stated that it makes the same request if a voter registration applicant inadvertently fails to check the box to confirm they are a citizen. (*Id.* at ¶ 156.) Because other parishes are not requesting documentary proof of citizenship, Plaintiffs allege that Lafayette Parish's actions discriminate in voting based on place of residence in violation of the Equal Protection Clause. (*Id.* at ¶¶ 158, 257.) Plaintiffs assert their Equal Protection claims against Defendant Meaux Menard as the Lafayette Parish Registrar of Voters and Defendant Landry for failing to provide guidance to Lafayette Parish on the issue. (*Id.* at ¶¶ 159, 250, 257.)

Plaintiffs also argue that Lafayette Parish's practices violate the facial eligibility provision of Section 8 of the NVRA, 52 U.S.C. § 20507(a)(1). (*Id.* at ¶ 228.) Section 8 of the NVRA requires each state to "ensure that any eligible applicant is registered to vote in an election" upon the timely submission of a valid voter registration application. 52 U.S.C. § 20507(a)(1). "A valid registration form with an oath or affirmation under penalty of perjury attesting to one's eligibility is sufficient to establish facial eligibility." (Doc. 61 at ¶ 229 (citing *Kobach*, 772 F.3d at 1194–95).) Louisiana's voter registration application forms—the Federal Form and the State Form—require applicants to attest, under penalty of perjury, that they are a United States citizen, which is sufficient to establish facial eligibility. (*Id.* at ¶ 104 (citing La. Stat. Ann. § 18:104(C)).)

While Louisiana may develop a State Form, it is required to "accept and use" the Federal Form to register voters for federal elections. (*Id.* at ¶¶ 91–92 (citing 52 U.S.C. §§ 20505(a)(1),

20508(a)(2), 20508(b)).) Further, the Supreme Court has held that states cannot "demand that an applicant submit additional information beyond that required by the Federal Form" for registration for federal elections. (*Id.* at ¶ 222 (citing *ITCA*, 570 U.S. at 15).) Act 500 only amends the statutory language concerning the State Form and therefore "only purports to amend the State Form." (*Id.* at ¶ 223.) However, Plaintiffs argue, if Act 500 is construed to apply to the Federal Form, it will violate the NVRA's "accept and use" provision. (*Id.* at ¶ 225.)

Finally, the public agencies provision of the NVRA, 52 U.S.C. § 20506(a)(6), requires designated state agencies to offer voter registration using the Federal Form or "its equivalent."[4] (*Id.* at ¶ 235.) An equivalent form must be "virtually identical" to the Federal Form so any such form cannot include "information necessary to determine voter eligibility that is not otherwise on the federal form." (*Id.* at ¶¶ 236–37 (quoting *Mi Familia Vota II*, 129 F.4th at 713–14).) Plaintiffs claim that if the designated state agencies require voter registration applicants using their services to provide proof of citizenship, the state agencies will be in violation of Section 7 of the NVRA, 52 U.S.C. § 20506(a)(6). (*Id.* at ¶ 240.)

Plaintiffs claim that Act 500 harms them in four main ways: diversion of resources; mission frustration; difficulties for voter registration events; and reputation, security, and liability concerns. All Plaintiffs expect to spend more time and money educating volunteers, members, and the community about how to register to vote under Act 500's proof of citizenship requirement. (*Id.* at ¶¶ 26–27, 51–52.) Plaintiffs will also need to purchase new equipment such as mobile scanners and printers to be able to successfully register voters at their voter registration events. (*Id.* at ¶¶ 24, 36, 53, 68.) These additional costs will divert resources away from Plaintiffs' core activities and frustrate their missions of voter education and registration. (*Id.* at ¶¶ 18, 27, 51–52, 71–76.)

[4] Defendants Matlock, Greenstein, Brumley, Schowen, and Cordell are each heads of one of these designated state agencies.

Plaintiffs claim they cannot plan future voter registration events until they receive guidance on how to comply with Act 500. (*Id.* at ¶¶ 20, 25, 38, 45–50, 65, 68.) Even if Plaintiffs host voter registration events, they will not be able to successfully register attendees because it is unlikely that applicants would have documentary proof of citizenship with them at the event, if they even have the documents at all.[5] (*Id.* at ¶¶ 21, 25, 33, 54–57, 69.) Finally, Plaintiffs argue that voter registration applicants will be distrustful of any attempts to copy, collect, or inquire into sensitive personal information. (*Id.* at ¶¶ 23, 37, 56, 70.) Plaintiffs wish to maintain their positions as trusted community partners and worry that collecting proof of citizenship documents will cause reputational harm and open the organizations up to security and liability concerns. (*Id.* at ¶¶ 23, 37, 56, 70.)

### *3. Causes of Action*

Plaintiffs assert three causes of action. Count I alleges a violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983. Count I is brought by all Plaintiffs against Defendant Landry. Counts II through V claim violations of the NVRA, 52 U.S.C. § 20501 *et seq*. Counts II (violation of the attestation provision) and IV (violation of the facial eligibility provision) are brought by all Plaintiffs against Defendant Landry. Counts III (violation of the accept and use provision) and V (violation of the public agencies provision) are brought by all Plaintiffs against Defendant Landry and the State Defendants. Counts VI and VII claim a violation of the Equal Protection Clause of

[5] "Many eligible voters in Louisiana, including members of Plaintiff organizations, do not possess documentary proof of citizenship or do not have readily available access to it. These citizens would face significant financial and practical burdens to both obtaining any required documentary proof of citizenship and submitting it with their voter registration application." (Doc. 61 at ¶ 165.)

the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983. Counts VI and VII are brought by all Plaintiffs against Defendants Landry and Meaux Menard.

#### *4. Prayer for Relief*

Plaintiffs request the Court to declare (1) "that S.B. 436's proof of citizenship requirement violates the First and Fourteenth Amendments" (*Id.* at ¶ 258); and (2) "that S.B. 436's proof of citizenship requirement violates the National Voter Registration Act of 1993." (*Id.* at ¶ 259.) Plaintiffs further request the Court to "[p]reliminarily and permanently enjoin all Defendants from enforcing S.B. 436's proof of citizenship requirement." (*Id.* at ¶ 260.) Moreover, Plaintiffs request the Court to (1) "[r]equire the Secretary of State to instruct the Registrar of Voters in each parish that S.B. 436's proof of citizenship requirement is enjoined and may not be implemented or enforced" (*Id.* at ¶ 261); and (2) "[r]etain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court." (*Id.* at ¶ 263.) Lastly, Plaintiffs request reasonable attorneys' fees and any other relief the Court deems proper. (*Id.* at ¶¶ 262, 264.)

### C. Procedural Background

Act 500 was enacted on January 1, 2025. 2024 La. Sess. Law Serv. Act 500 (S.B. 436). To comply with the NVRA's notice requirement, *see* 52 U.S.C. § 20510(b)(1)–(2), Plaintiffs sent a letter to Defendant Landry on January 28, 2025, notifying her that Act 500's requirement of "documentary proof of citizenship to register and vote . . . violates the [NVRA]." (Doc. 1-1 at 3.) Two days later, on January 30, 2025, Louisiana (via Defendant Landry) requested that the EAC consider revisions to the state-specific instructions included in the Federal Form. (*See* Doc. 46-3 at 2.)

On May 14, 2025, Plaintiffs filed their *Complaint*, alleging violations of the First and Fourteenth Amendments, as well as Sections 6, 7, 8, and 9 of the NVRA, 52 U.S.C. §§ 20505(a)(1)–(2), 20506, 20507(a)(1), 20508(b). (Doc. 1 at ¶¶ 179–221.) Throughout 2025,

Louisiana modified its request to the EAC multiple times and asked the Court to stay these proceedings until the EAC responded. (Doc. 46 at 1; Doc. 46-4 at 5; Doc. 58-1 at 2–3.) On December 8, 2025, the Court denied Defendants' motion to stay this proceeding until the EAC responded about the requested revisions. *League of Women Voters of La. v. Landry*, No. 25-413, 2025 WL 3516786 (M.D. La. Dec. 8, 2025) (deGravelles, J.). Ultimately, on January 8, 2026, the EAC rejected the requested options to amend the state-specific instructions. (Doc. 91 at 9.) Following that decision, the State of Louisiana and Defendant Landry filed suit against the EAC on April 14, 2026. (Doc. 103 at 1 (citing *State of La. v. U.S. Election Assistance Comm'n*, No. 3:26-cv-01191 (W.D. La. 2026)[6]).)

Plaintiffs filed their *Amended Complaint* on December 10, 2025, after they learned that Lafayette Parish requested documentary proof of citizenship to process a voter registration application per S.B. 436. (Doc. 61; Doc. 61-4 at 2–3.) The *Amended Complaint* realleges violations of the First and Fourteenth Amendments, as well as Sections 6, 7, 8, and 9 of the NVRA and adds Equal Protection claims against Defendants Landry and Meaux Menard. On February 27, 2026, Defendants filed this *MTD*. (Doc. 86 at 1.)

## II. Discussion

### A. Summary of Ruling

Defendants filed their *MTD* pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim. (*Id.*) Regarding Defendants' 12(b)(1) argument, Defendants assert that Plaintiffs' suit must be dismissed because (1) Plaintiffs failed to comply with the NVRA's notice requirement; (2) Plaintiffs lack standing; (3) Plaintiffs' claims are not ripe; and (4) Defendant Landry and the State Defendants have sovereign immunity.

[6] This lawsuit is still pending. The EAC only recently filed its answer on August 17, 2026.

(Doc. 86-1 at 2.) With respect to Defendants' 12(b)(6) argument, Defendants assert that (1) Plaintiffs have not adequately pled a vagueness claim; (2) Plaintiffs have not adequately pled Equal Protection claims; and (3) Plaintiffs have not adequately pled NVRA claims. (*Id.* at 2–3.) In short, the Court will grant in part and deny in part Defendants' *MTD*.

The Court finds that with regard to Defendants' NVRA notice arguments, the *MTD* is granted because the January 28, 2025, letter did not contain any existing violations of the NVRA. Therefore, the NVRA claims, Counts II–V, and the State Defendants, are dismissed without prejudice.

With respect to Defendants' Article III standing argument, the Court finds the Plaintiffs do have Article III associational standing. With respect to this issue, Defendants' *MTD* is denied.

Regarding Defendants' ripeness arguments, the Court finds the remaining claims—the Constitutional challenges—are ripe because of Lafayette Parish's requests for proof of citizenship. Consequently, the *MTD* is denied.

With respect to Defendants' sovereign immunity arguments, the *MTD* is denied. The Court finds there to be a scintilla of enforcement activity ongoing by the Secretary of State to trigger the *Ex parte Young* exception to sovereign immunity.

Moreover, regarding Defendants' vagueness argument, their *MTD* is denied as the Court finds that Plaintiffs have alleged facts that plausibly show that Act 500 does not sufficiently explain how voter registration applicants can comply with it.

The Court also finds that Plaintiffs have plausibly alleged that Lafayette Parish's requests for proof of citizenship discriminate based on national origin and disparately treat similarly situated voters based on parish of residence in violation of the Equal Protection Clause. Therefore, Defendants' *MTD* regarding this argument is denied.

Finally, the Court will not address Defendants' argument that Plaintiffs did not adequately plead NVRA claims as those were dismissed for lack of subject matter jurisdiction.

Further, the Court will grant Plaintiffs leave to amend to address the above-mentioned deficiencies if same can be cured in good faith.

**B. MTD: Jurisdictional Challenges**

***1. Rule 12(b)(1) Standard***

A party may raise the defense of lack of subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)); *accord Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010.

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Relevant here, "[a] facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644

F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Paterson*, 644 F.2d at 523. "If those jurisdictional allegations are sufficient the complaint stands." *Id.*

On the other hand, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "[N]o presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Mortensen*, 549 F.2d at 891). Given a factual attack, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### ***2. NVRA Notice Requirement***

#### a. Parties' Arguments

##### *1. Defendants' MTD (Doc. 86-1)*

Defendants acknowledge that Plaintiffs sent Defendant Landry a letter on January 28, 2025, that Plaintiffs "call an NVRA notice." (Doc. 86-1 at 24.) The letter warned that "enforcement of SB 436 . . . will place you in violation of 52 U.S.C. §§ 20504, 20505, 20506, 20507, and 20508." (*Id.* (quoting Doc. 61-1 at 6).) However, Defendants argue that Secretary Landry had not taken any action to enforce Act 500 as of the time the letter was sent, so there was no violation to correct. (*Id.*) Defendants' only action was to request EAC approval to amend the Federal Form's Louisiana-specific instructions. (*Id.*; Doc. 46-3.) Defendants do not view that request as an enforcement

action. Therefore, Defendants argue, there was no violation and thus "no requisite notice that could constitute the exhaustion required before a plaintiff files an NVRA suit." (Doc. 86-1 at 25.)

2. *Plaintiffs' Opposition (Doc. 91)*

Plaintiffs argue that the January 28, 2025, letter is a valid NVRA notice letter because it informed Secretary Landry that enforcement of Act 500 would violate the NVRA. They also claim an NVRA violation occurred when Act 500 went into effect on January 1, 2025, with no guidance from Defendants on how it would be implemented. (Doc. 91 at 21.) Plaintiffs cite two cases to explain that some courts have allowed NVRA claims to proceed even when the challenged statue was only newly enacted when notice was provided. (*Id.* at 20 (citing *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 988 (D. Ariz. 2024); *Mi Familia Vota II*, 129 F.4th at 719–20; *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)).) Because Plaintiffs sent a valid letter and filed suit more than 90 days after it was sent, they meet the NVRA notice requirement. (*Id.* at 21.)

3. *Defendants' Reply (Doc. 99)*

Defendants reassert their argument that the January 28, 2025, letter did not identify any then-existing violations, it only warned of "hypothetical future violation[s]." (Doc. 99 at 7–8.) Defendants argue that the letter was therefore insufficient because it did not identify a violation they could cure in 90-day period. (*Id.*) Plaintiffs' suit should be barred because of failure to comply with NVRA notice provision. (*Id.* (citing *Scott v. Schedler*, 771 F.3d 831, 834 (5th Cir. 2014)).)

4. *Plaintiffs' Sur-Reply (Doc. 109)*

Plaintiffs do not address the NVRA notice issue in their *sur-reply*.

b. Applicable Law

Under 52 U.S.C. § 20510(b),

> (1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.
> (2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.
> (3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

"The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Ga. State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012) (citing *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997)). In relation to this purpose, "courts have found that an NVRA notice is sufficient if it 'sets forth the reasons for [the] conclusion' that a defendant failed to comply with the NVRA, and, when 'read as a whole, [it] makes it clear that [the plaintiff] is asserting a violation of the NVRA and plans to initiate litigation if its concerns are not addressed in a timely manner.'" *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1348 (N.D. Ga. 2016) (alterations in original) (quoting *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012)). "[N]otice as to one potential NVRA violation is not the equivalent of notice as to all potential NVRA violations." *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1334 (S.D. Fla. 2017). "Rather, a potential NVRA defendant must have notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Id.*

Notice is mandatory. *Scott*, 771 F.3d at 836. The NVRA provides that "[i]f the violation is not corrected within 90 days after receipt of [the] notice . . . the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the

violation." 52 U.S.C. § 20510(b)(2). "No standing is therefore conferred if no proper notice is given, since the 90–day period never runs." *Scott*, 771 F.3d at 835 (quoting *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335).

c. Analysis

To determine what NVRA violations Plaintiffs gave Defendants notice of, the Court must look to the language of the January 28, 2025 letter. Again, the purpose of a notice letter is to alert Defendants of exactly what NVRA violation has occurred so they have an opportunity to cure such violation before litigation ensues. *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335. Plaintiffs' letter explains how enforcement of Act 500 *would* violate various provisions of the NVRA, including the "accept and use," "attestation," "facial eligibility," and "public agency" provisions. (Doc. 1-1 (citing 52 U.S.C. §§ 20504–20508).) It details how Act 500 *could* be interpreted to violate the NVRA and explains that some potential actions to implement it "would" violate the NVRA. (*Id.* at 4.) However, the letter does not complain of specific actions taken by Defendants. It only states that Defendant Landry is "responsible for ensuring Louisiana's compliance with the NVRA" and that "enforcement of SB 436's DPOC provision to NVRA-mandated methods of registration *will* place [her] in violation of 52 U.S.C. §§ 20504, 20505, 20506, 20507, and 20508." (*Id.* at 6 (emphasis added).) The letter seems to be asking Secretary Landry to do nothing or risk violation, instead of explaining what she did that was a violation.

The speculative statements in the letter do not provide Defendants "the opportunity to attempt compliance" before facing litigation because the statements do not describe any actions Defendants could stop, nor do they give "notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335; *Bellitto*, 268 F. Supp. 3d at 1334.

The letter only explains why the law will violate the NVRA if enforced. Courts generally require NVRA notice letters to detail specific violative acts in order for the letter to constitute sufficient notice. *Scott*, 771 F.3d at 836; *Voice of the Experienced v. Ardoin*, No. 23-331, 2024 WL 2142991, at *31–32 (M.D. La. May 13, 2024) (deGravelles, J.); *Georgia State Conf. of NAACP*, 841 F. Supp. 2d at 1333–34; *Project Vote, Inc.*, 208 F. Supp. 3d at 1348. "It is not enough that a potential NVRA defendant has general notice that an individual or organization believes it to be in violation of the NVRA before facing litigation." *Bellitto*, 268 F. Supp. 3d at 1334.

The Fifth Circuit upheld the district court's determination that plaintiff's letter complied with the NVRA notice requirement in *Scott*, 771 F.3d at 840. The letter in that case explained that defendants violated the NVRA by failing to provide voter registration applications to numerous individuals. Complaint ¶ 85, *Scott v. Schedler*, 2016 WL 11901085 (E.D. La. Feb. 22, 2016) (No. 11 Civ. 926), *aff'd in part*, 771 F.3d 831, 840 (5th Cir. 2014). The letter provided specific instances of violations and asked the defendants to develop a plan to remedy those violations. *Id.* at ¶¶ 86–87. Therefore, the district court and the Fifth Circuit found the letter to be sufficient NVRA notice. *Scott*, 771 F.3d at 840.

In *Voice of the Experienced v. Ardoin*, this Court found sufficient plaintiffs' letter detailing specific instances of parish registrars requiring documentation in violation of the NVRA. *Voice of the Experienced*, 2024 WL 2142991, at *31–32. Plaintiffs' letter in that case detailed how parish registrars were applying an outdated interpretation of the law and wrongly requiring formerly incarcerated persons to provide proof that they were no longer under an order of imprisonment. Complaint, Ex. 1, *Voice of the Experienced v. Ardoin*, 2024 WL 2142991 (M.D. La. May 13, 2024) (No. 23 Civ. 331). The letter explained that Louisiana election law had recently changed to remove the documentation requirement. *Id.* It went on to explain that the requests for documentation not

only violated the new Louisiana law, but also the NVRA. *Id.* Finally, the letter asked the Secretary of State, the defendant in the case, to issue guidance to all parishes on the new law. *Id.* As a whole, the letter detailed a specific instance of a violation and asked the defendant to take action to correct the violation.

In *Georgia State Conference of NAACP v. Kemp*, the court found sufficient a letter that explained actions Georgia took that violated the NVRA. *Georgia State Conf. of NAACP*, 841 F. Supp. 2d at 1333–34. The letter alleged that Georgia systematically failed to provide voter registration services in violation of the NVRA. *Id.* at 1334. To support that general allegation, plaintiffs provided results from a survey they conducted in which they visited various voter registration offices to test the sufficiency of the services. *Id.* Plaintiffs provided detailed statistics about the offices' performance. *Id.* The court thought the inclusion of those statistics was compelling and found the letter to be adequate. *Id.*

The sufficient letter in *Project Vote, Inc. v. Kemp* described five detailed ways Georgia failed to respond to a records request in violation of the NVRA. *Project Vote Inc.*, 208 F. Supp. 3d at 1347. The letter went on to clearly state an affirmative action for Georgia to take to comply with the NVRA—namely, to provide the requested records. *Id.* at 1348. Because the letter described a violation and explained steps the defendants could take to remedy the violation, the court found the letter to be sufficient NVRA notice. *Id.* at 1347–48.

Plaintiffs' letter in this case is unlike any of those letters. First, the letter does not point to specific conduct taken by any Defendant or parish registrar, like in *Scott* or *Voice of the Experienced*. Plaintiffs' letter only explains in general terms how Plaintiffs think Act 500 itself violates the NVRA. Second, Plaintiffs' general allegation of an NVRA violation is not supported by any statistics or specific examples like in *Georgia State Conference of NAACP*. Plaintiffs in

that case also made a general allegation, but they backed it up with data. While Plaintiffs are not required to conduct a survey or provide detailed specifics, they are required to provide at least one instance of a specific action Defendants took in violation of the NVRA. Third, the letter does not ask Defendants to take any action, like the letters in *Voice of the Experienced* and *Project Vote* did. In fact, the letter asks the Defendants not to take action because taking action to enforce Act 500 could lead to an NVRA violation. Because Plaintiffs' letter does not provide details of a specific action that Defendants took constituting an NVRA violation, it does not constitute sufficient notice under the NVRA.

In one case the court found a letter to constitute sufficient notice even though it did not detail a specific violation. *Judicial Watch, Inc.*, 993 F. Supp. 2d at 922. Like the letter at issue in this case, the letter in *Judicial Watch* did not provide details about an alleged NVRA violation but spoke only of an "apparent violation" and used language such as "we believe." *Id.* Nevertheless, the court found the letter sufficient because of the specific NVRA provision at issue, 52 U.S.C. § 20507(a)(4). *Id.* That provision does not contain detailed requirements; it only requires "reasonable effort," so the court did not think the letter needed to contain detailed allegations of violations. *Id.* Unlike *Judicial Watch*, Plaintiffs do not allege a violation of 52 U.S.C. § 20507(a)(4). None of the provisions that Plaintiffs allege violations of require "reasonable effort." Therefore, *Judicial Watch* is inapplicable.

Plaintiffs cite two cases where courts allowed NVRA claims to proceed when the challenged statue was only newly enacted when notice was provided. *Mi Familia Vota*, 719 F. Supp. 3d 929 (D. Ariz. 2024); *Fla. State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Browning*, No. 07-402, 2007 WL 9697660 (N.D. Fla. Dec. 18, 2007). While these cases do involve newly enacted election laws that allegedly violate the NVRA, NVRA notice letters

were not at issue in either of them. Neither case addresses the sufficiency, or lack thereof, of an NVRA notice letter so they are inapplicable to this issue.

To be sure, Plaintiffs' letter could not have included details of a specific action because, as of January 28, 2025, when the letter was sent, Defendants had not done anything to enforce Act 500. It was not until January 30, 2025, that Defendant Landry took action to enforce Act 500 when she sent her request to the EAC. Lafayette Parish's requests for documentary proof of citizenship pursuant to Act 500 did not occur until April 15, 2025. While those two actions may violate the NVRA, Defendants never received a notice letter from Plaintiffs alleging that. The NVRA pre-suit notice requirement is violation specific. 52 U.S.C. § 20510; *Bellitto*, 268 F. Supp. 3d at 1334. A plaintiff cannot sue for an NVRA violation that is not named in an NVRA notice letter, even if a prior sufficient letter was sent. *Bellitto*, 268 F. Supp. 3d at 1334; *Voice of the Experienced*, 2024 WL 2142991, at *32 (limiting plaintiff's NVRA claims to only those that were named in the notice letter). Even though Plaintiffs' complaint details these two potential violations, their NVRA notice letter did not, so their NVRA claims are foreclosed.

Nothing in the law prevents Plaintiffs from amending their complaint after sending a new, sufficient NVRA notice letter, assuming Defendants fail to remedy the violation within 90 days. *See Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 644–45 (M.D. La. 2025) (deGravelles, J.) (allowing plaintiffs to amend their complaint, which was originally filed before plaintiffs sent an NVRA notice letter, to include the later-filed notice letter and reassert their NVRA claims).

For these reasons, the Court finds that Plaintiffs did not satisfy the NVRA's notice requirement. Therefore, Defendants' *MTD* with respect to this issue is granted, and all NVRA claims are dismissed without prejudice.

### 3. *Article III Standing*

a. <u>Parties' Arguments</u>

1. *Defendants' MTD (Doc. 86-1)*

Defendants explain that Plaintiffs bear the burden of establishing standing by showing they have suffered an injury in fact, that is fairly traceable to the challenged conduct of the defendant, and that is likely to be redressed by a favorable judicial decision. (Doc. 86-1 at 17 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).) An organization may have standing by showing it can sue on behalf of its members (associational standing) or it can sue in its own right (organizational standing). (*Id.* at 17–18 (citing *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 285 (5th Cir. 2025)).) Defendants cite *Hunt v. Washinton State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), to explain that associational standing requires a plaintiff organization to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Id.* at 21) Defendants state that "[o]rganizations suing on their own behalf 'must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals.'" (*Id.* at 18 (citing *La Union Del Pueblo Entero*, 151 F.4th at 285 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024))).) Defendants claim that Plaintiffs do not have standing under either theory. (*Id.*)

Defendants dispute Plaintiffs' arguments that they have associational standing. (*Id.* at 20.) Defendants claim the alleged member injury is too speculative and not traceable to Defendants' conduct. (*Id.* at 21.) Defendants view the alleged member injury to be the time and cost of obtaining proof of citizenship so members can register to vote, assuming members do not already have proof and are not currently registered to vote. (*Id.* at 21–22.) According to Defendants, Plaintiffs have not alleged a member has suffered such an injury, and even if they had, Defendants and Act 500

are not responsible for the difficulties in obtaining proof of citizenship. (*Id.*) Therefore, Defendants argue, Plaintiffs do not have associational standing because none of their members have standing.

Defendants also argue that Plaintiffs lack organizational standing because they have not suffered an injury. (*Id.* at 18.) Plaintiffs' organizational standing theories are insufficient under *Alliance for Hippocratic Medicine*, 602 U.S. at 393–94, because plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." (*Id.* at 17–18 (quoting *La Union Del Pueblo Entero*, 151 F.4th at 285).) Defendants explain that "[o]nly in the rarest cases can organizations demonstrate standing by showing a defendant's action interferes with their activities." (*Id.* at 18 (quoting *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 318 (5th Cir. 2025)).) Defendants contend this is not one of those rare cases. (*Id.*)

Defendants reject Plaintiffs' argument that diversion of resources is a cognizable Article III injury. (*Id.*) Defendants state that the diversion of resources is self-inflicted because Act 500 does not require Plaintiffs to adjust their operations. (*Id.*) Defendants also reject Plaintiffs' argument that mission frustration and difficulties holding registration events are cognizable Article III injuries. (*Id.* at 19.) Defendants cite *Deep South Center for Environmental Justice*, 138 F.4th at 319, to support their argument: "Even if [the law] makes it more difficult for [Plaintiffs] to achieve [their] mission . . . that is not the kind of impediment *Alliance* requires." (*Id.*) Finally, Defendants contest Plaintiffs' arguments that reputational harm is a sufficient Article III injury. (*Id.*) The potential reputational harm is based on a "chain of speculation" that "precludes standing." (*Id.* at 19–20 (quoting *Deep S. Ctr. for Env't Just.*, 138 F.4th at 323).) Therefore, because Plaintiffs themselves have not suffered injury, they do not have organizational standing. (*Id.* at 18.)

2. <u>*Plaintiffs' Opposition (Doc. 91)*</u>

Plaintiffs argue they have adequately alleged associational and organizational standing. (Doc. 91 at 12.) Plaintiffs agree with Defendants that *Washington State Apple Advertising Commission*, 432 U.S. at 343, defines the requirements for associational standing. (*Id.* at 16.) Plaintiffs disagree that any member injury is speculative and not traceable to Defendants. (*Id.* at 17.) Plaintiff League alleges it has members who are United States citizens who were born abroad but are eligible to vote in Louisiana. (*Id.* (citing Doc. 61 at ¶ 28).) Plaintiff League goes on to allege that these members would have to provide proof of citizenship because they live in Lafayette Parish and would be subject to Defendant Meaux Menard's practices. (*Id.* (citing Doc. 61 at ¶ 28).) Therefore, according to Plaintiffs, the injury is not speculative and is "certainly impending." (*Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).) Further, Plaintiffs explain, the injury is traceable to Defendants because they are responsible for enforcing Act 500's proof of citizenship requirement. (*Id.* at 18.) Plaintiffs conclude, because Plaintiffs' members would have standing to sue, Plaintiffs have sufficiently pled associational standing. (*Id.*)

Like Defendants, Plaintiffs cite *La Union Del Pueblo Entero*, 151 F.4th at 285, to explain the requirements for organizational standing. (*Id.* at 13.) Plaintiffs also recognize that *Alliance for Hippocratic Medicine*, 602 U.S. at 394, requires an organization to show more than a setback to its social interests to establish organizational standing. (*Id.*) But, say Plaintiffs, in *Alliance*, the Supreme Court recognized that interference with an organization's core business activities is a constitutionally cognizable injury. (*Id.* (citing *All. for Hippocratic Med.*, 602 U.S. at 395).) Plaintiffs also cite *Nairne v. Landry*, 151 F.4th 666, 682 (5th Cir. 2025), which held that "organizations may establish standing when a defendant's conduct directly interferes with their core business activities." (*Id.*) Plaintiffs' core business activity is registering voters. (*Id.*) Plaintiffs

contend that Act 500 interferes with their ability to register voters because they do not know what documentation is required to successfully register a voter. (*Id.* at 13–14.) Therefore, according to Plaintiffs, they have alleged an injury sufficient to establish organizational standing.

#### 3. *Defendants' Reply (Doc. 99)*

Defendants repeat the same arguments as in their *MTD*. First, they argue that Plaintiffs do not have organizational standing because the organizations themselves have not suffered a cognizable injury. (Doc. 99 at 2–3.) Second, they claim that even if Plaintiffs have members who will have to provide proof of citizenship to register to vote, those individuals will not suffer an injury traceable to Defendants. (*Id.* at 6.) Defendants claim the only potential injury would be the cost of obtaining proof of citizenship and that is not traceable to Defendants. (*Id.*) Defendants ignore the potential injury in the form of discrimination based on national origin or disparate treatment of similarly situated voters based on parish of residence.

#### 4. *Plaintiffs' Sur-Reply (Doc. 109)*

Plaintiffs' *Sur-Reply* is limited to the issue of their members' injuries. (Doc. 109 at 4.) Plaintiffs explain that their members, specifically those in Lafayette Parish who may be asked to provide proof of citizenship, are subject to disparate treatment based on parish of residence and national origin. (*Id.*) Plaintiffs trace that injury to Defendant Meaux Menard's request for proof of citizenship and Defendant Landry's failure to stop that practice. (*Id.* at 5.)

### b. Applicable Law

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue' . . . ." *Murthy*, 603 U.S. at 57 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *accord Dep't of Com. v. New York*, 588 U.S. 752 (2019). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or

imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 409 (internal quotation marks omitted)). "These requirements help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Id.* at 58. (first alteration by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1922)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)).

Additionally, "standing is not dispensed in gross." *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Further, in the case of multiple plaintiffs, as long as one plaintiff has standing to bring a claim, the other plaintiffs do as well. *See id.* Plaintiff organizations can establish standing by showing they can sue on behalf of their members (associational standing) or

in their own right (organizational standing). *La Union del Pueblo Entero v. Abbott*, No. 25-50246, 2026 WL 2333656, at *2 (5th Cir. Aug. 12, 2026).

Associational standing allows an organization to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Wa. State Apple Advert. Comm'n*, 432 U.S. at 343. Because the organization's members should otherwise have standing to sue in their own right, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* at 342 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). The relief sought, such as a declaration, injunction, or other form of prospective relief, also must be for "the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.

In *Hancock County Board of Supervisors v. Ruhr*, local branches of the NAACP brought suit against Mississippi officials alleging that "the county's supervisor districts violated the Fourteenth Amendment's 'one person, one vote' guarantee." *Ruhr*, 487 F. App'x at 192. They sought declaratory and injunctive relief. *Id.* The district court dismissed the various complaints for lack of standing, but the Fifth Circuit vacated this order. *Id.*

In its discussion, the Fifth Circuit quoted the *Lujan* factors and then stated, "'At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 195 (quoting *Lujan*, 504 U.S. at 561 (internal

quotation marks and alterations omitted); and citing *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) ("At the pleading stage, allegations of injury are liberally construed.")).

As to the NAACP's standing, the Fifth Circuit easily dispensed with the second and third elements of associational standing, explaining:

> Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission. Furthermore, adjudicating a "one person, one vote" claim does not demand factual development about any individual NAACP member; no factual inquiry is necessary beyond the fact that the member is a voter in an overpopulated, under-represented district. Likewise, to determine whether to grant the requested relief of delaying election deadlines and elections, the district court would not need individualized information about NAACP members.

*Id.* at 197–98 (citations omitted).

Defendants in that case complained that the NAACP branches did not adequately allege an injury-in-fact on behalf of their members. *Id.* at 198. Defendants specifically argued that "no complaint identified, by name, any member of the local NAACP branch who was a voter from an overpopulated, under-represented district and who thereby suffered a 'one person, one vote' injury." *Id.* Defendants urged:

> [A] complaint cannot be said to allege a concrete, particularized injury without setting forth the name of an NAACP member who was allegedly injured; an NAACP branch may not establish associational standing by asserting, in the abstract, that some of its members reside in overpopulated, under-represented districts. In other words, according to appellees, the NAACP branches must name names.

*Id.* The Fifth Circuit rejected this argument, explaining:

> Yet appellees offer no authority for the proposition that an NAACP branch must identify a particular NAACP member *at the pleading stage.*[7] We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based

[7] The Fifth Circuit has required a plaintiff organization to identify a particular member by name after the pleading stage. *See La Union del Pueblo Entero*, 2026 WL 2333656, at *3. On appeal the Fifth Circuit held that plaintiff organization did not have associational standing because they named only one member who was injured. *Id.* Further, the record did not support that the member suffered a substantial risk of future injury. *Id.*

> on a lack of associational standing. *Cf. Church of Scientology v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981) ("[I]n determining whether an association has standing to bring suit on behalf of its members, neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites."). Additionally, the NAACP branches were not merely alleging that some members *might* suffer a "one person, one vote" violation. The NAACP branches were alleging that some members *were* suffering such a violation. By alleging that some of its members were voters from overpopulated and under-represented districts, the NAACP branches adequately alleged that some of its members were suffering a concrete, particularized injury. We conclude that each NAACP branch adequately pleaded the elements of associational standing.

*Id.* at 198–99. The Fifth Circuit concluded, "Overall, we hold that the NAACP plaintiffs and any individual plaintiff who is alleged to be a voter in an overpopulated, under-represented district has adequately alleged facts supporting standing. We disagree with those portions of the district court orders dismissing the complaints for lack of standing." *Id.* at 199.

c. Analysis

The Court finds that Plaintiffs have adequately alleged associational standing for League. Construing the *Amended Complaint*'s allegations "liberally" as the Court is required to do at the pleading stage, *Ruhr*, 487 F. App'x at 195 (quoting *Little*, 575 F.3d at 540), the Court finds that these allegations (specifically those in ¶¶ 28–29) satisfy the three requirements for associational standing. As in *Ruhr*, Plaintiffs easily meet the second and third prerequisites. The interests League seeks to protect are clearly germane to the organization's purpose, as Plaintiffs allege that "League works to ensure that all eligible individuals have the opportunity and the information needed to register and vote" because "voter registration is [League's] signature activity and core to its mission." (Doc. 61 at ¶¶ 13, 15.) *Ruhr*, 487 F. App'x at 197–98; *La. St. Conf. of Nat'l Assoc. for Advancement of Colored People v. Louisiana*, 490 F. Supp. 3d 982, 1012–13 (M.D. La. 2020) (deGravelles, J.). Further, the relief sought (a declaration that Act 500 violates the First and Fourteenth Amendments; an injunction to stop Defendants from enforcing Act 500;

and an instruction from the Secretary of State to the Registrar of Voters in each parish that Act 500 is enjoined and may not be implemented or enforced) does not require the participation of individual members of League.

Defendants mainly complain of Plaintiffs' failure to identify any member who has suffered injury because of Act 500. But Plaintiffs do not have to name a specific member. *Ruhr*, 487 F. App'x at 198 ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing . . . *at the pleading stage*."). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 195 (quoting *Lujan*, 504 U.S. at 561) "[A]ccept[ing] all well-pleaded facts as true and constru[ing] the complaint in the light most favorable to the plaintiff," League has sufficiently alleged for each of its constitutional claims that it has members who have suffered injury because of Defendants' actions. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)).

League has members who are being discriminated against on the basis of national origin. League has alleged that it has members who live in Lafayette Parish, who are eligible to vote in Louisiana because they are United States citizens, but were born abroad. (Doc. 61 at ¶ 28.) These individuals would have to provide proof of citizenship when registering to vote because Defendant Meaux Menard's office "ask[s] for a United States passport, Naturalization paper, or . . . birth certificate if [the applicants] were born abroad." (Doc. 49-2 at 2.) Seemingly, Defendant Meaux Menard processes voter registration applications differently based on the applicant's national origin. League's members have suffered injury from that discriminatory practice. The injury these

members suffered provides standing for League to allege a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.

League also has members who are suffering disparate treatment of similarly situated voters based on parish of residence. As just described, League alleges it has members who would have to provide proof of citizenship when registering to vote in Lafayette Parish. However, if these same members lived in a different parish, they would not have to provide proof of citizenship because no other parish is requesting proof. Therefore, similarly situated voters are subject to different voter registration processes based on their parish of residence. League's members have suffered injury from that discriminatory practice. The injury these members suffered provides standing for League to allege a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.

Finally, League has members who have suffered injury because of Act 500's vagueness. Again, League alleges it has members who would have to provide proof of citizenship when registering to vote in Lafayette Parish. These members lack guidance on what constitutes proof of citizenship. The Lafayette Parish Register of Voters Office itself questioned if a REAL ID is acceptable proof of citizenship. (*Id.* at 2.) Therefore, these members do not know how to comply with Act 500. The injury these members suffered provides standing for League to allege a violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.

Plaintiff League has members who would otherwise have standing to sue in their own right for each of the constitutional claims brought. Additionally, the interests League seeks to protect with this suit are germane to its purpose and neither the claim asserted nor the relief requested requires the participation of League's individual members. Therefore, League has sufficiently

alleged associational standing. Because the Court finds that League has associational standing, it need not address organizational standing. Additionally, because Plaintiff League has standing, all Plaintiffs have standing to bring suit. *See Town of Chester*, 581 U.S. at 439. This part of Defendants' *MTD* is denied.

#### ***4. Ripeness***

a. <u>Parties' Arguments</u>

*1. <u>Defendants' MTD (Doc. 86-1)</u>*

Defendants argue Plaintiffs' claims are unripe because Act 500 has been enacted but not yet implemented, pending EAC approval of an implementation plan. (Doc. 86-1 at 10–13.) As such, Defendants say the claims "are not 'fit for judicial decision,'" and "there would be no 'hardship to the parties' if the court withheld its consideration." (*Id.* at 23 (quoting *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 930 (5th Cir. 2023)).) Defendants contend that Plaintiffs' "case is contingent upon a future implementation of Act 500 that may not occur," which is "the precise 'speculation' that the fitness prong should guard against." (*Id.* (quoting *Braidwood Mgmt., Inc.*, 70 F.4th at 930).) Defendants also argue that Plaintiffs face no hardship if the Court withholds review "because their supposed injury is entirely conjectural." (*Id.*) Defendants believe this is a pre-enforcement challenge and any hardship "must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'" (*Id.* (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006)).)

*2. <u>Plaintiffs' Opposition (Doc. 91)</u>*

Plaintiffs point out that Defendants say Act 500 "took effect" over a year ago and Defendant Landry has begun "implementation" of Act 500, but it is not enforcing it. (Doc. 91 at 19 (quoting Doc. 86-1 at 2).) Plaintiffs claim this distinction has no legal basis and that Defendants Landry and

Meaux Menard are enforcing Act 500 by requiring proof of citizenship in voter registration applications in Lafayette Parish. (*Id.*) Further, Defendant Landry's request to the EAC constitutes enforcement. (*Id.* at 8.) Therefore, according to Plaintiffs, their claims are fit for judicial decision, and Plaintiffs would suffer hardship if review were withheld because Plaintiffs and their members "suffer harms from Act 500 and Defendants' implementation of it." (*Id.* at 19 (citing *Braidwood Mgmt., Inc.*, 70 F.4th at 930).) "Plaintiffs' Fourteenth Amendment claims against Defendant Menard and Defendant Landry are unquestionably ripe." (*Id.* at 19–20.)

*3. Defendants' Reply (Doc. 99)*

Defendants again argue that Plaintiffs' claims are based on "contingent future events that may not occur as anticipated, or indeed may not occur at all." (Doc. 99 at 7 (quoting *Roake v. Brumley*, 170 F.4th 292, 297 (5th Cir. 2026)).) If a court cannot evaluate a law's constitutionality "without resorting to conjecture," the claim is not ripe. (*Id.* (quoting *Roake*, 170 F.4th at 299).) Defendants also cite *Roarke* to explain that "an unripe challenge does not become ripe merely because a party asserts that the challenged action would be unlawful on any conceivable set of facts." (*Id.* (quoting *Roake*, 170 F.4th at 299).)

*4. Plaintiffs' Sur-Reply (Doc. 109)*

Plaintiffs again argue that Defendants' distinction that Act 500 is not being enforced and is only being implemented has no legal basis. (Doc. 109 at 5.) Plaintiffs further argue that Defendants have taken steps to enforce Act 500 by submitting requests to the EAC and asking for proof of citizenship for some voter registration applications in Lafayette Parish. (*Id.* at 5–6.) Therefore, their claims are fit for judicial review.

Plaintiffs further develop their argument that they will suffer hardship if their claims are not heard, citing the case Defendant Landry filed against the EAC, *State of Louisiana v. U.S.*

*Election Assistance Comm'n*, No. 3:26-cv-01191 (W.D. La. 2026). (*Id.*) "Because guidance to the registrars hinges on the timing of another federal court's decision . . . the facial vagueness of Act 500, Defendant's failure to clarify it, and the disparate application of the statue depending on parish of residence and national origin, will continue." (*Id.* at 6.)

b. Applicable Law

"Under Article III of the Constitution, federal courts are confined to adjudicating 'cases' and 'controversies.'" *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017) (quoting *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000)). "And to be a case or controversy for Article III jurisdictional purposes, the litigation 'must be ripe for decision, meaning that it must not be premature or speculative.'" *Id.* (first quoting *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002); and then citing *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012)). *See also Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985) ("[The] basic rationale" of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))). "In other words, 'ripeness is a constitutional prerequisite to the exercise of jurisdiction.'" *Lower Colo.*, 858 F.3d at 922 (quoting *Shields*, 289 F.3d at 835).

"First, a claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Id.* (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). "So, if a claim is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe." *Id.* at 930–31 (quoting *Thomas*, 473 U.S. at 580–81 (quotation omitted)). But, "[i]ssues have been deemed ripe when they would not benefit from any further factual development and when the court would

be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003)). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581 (quoting *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923))).

Second, the Court must evaluate if Plaintiffs have "shown that hardship will result if court consideration is withheld at this time." *Choice Inc. of Tex.*, 691 F.3d at 715. The question is whether "the impact of the law upon the [Plaintiffs] is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Lab'ys*, 387 U.S. at 152. "An assessment of hardship often turns on a straight-forward prediction of the course events are likely to take." 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3532.3 (3d ed. 2024). "Although it often is difficult to make secure predictions of the probable occurrence or severity of future injury in any particular case, there is nothing complicated about the process." *Id.* The Fifth Circuit "has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being force[d] . . . to modify [one's] behavior in order to avoid future adverse consequence." *Choice Inc. of Tex.*, 691 F.3d at 715 (alteration in original) (internal quotation marks omitted). A plaintiff can meet the ripeness doctrine's hardship prong by satisfying just one. *Id.*

c. Analysis

The Court finds that Plaintiffs' Equal Protection claims are ripe. First, the Court must determine whether the case is "fit for judicial decision." *Braidwood Mgmt., Inc.*, 70 F.4th at 930

(citing *New Orleans Pub. Serv., Inc.*, 833 F.2d at 586–87). If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe. *Braidwood Mgmt., Inc.*, 70 F.4th at 930–31 (quoting *Thomas*, 473 U.S. at 580–81). The Equal Protection claims at issue in this case are not contingent on future events. Lafayette Parish has requested documentary proof of citizenship for voter registration applications. (Doc. 61 at ¶¶ 154, 157; Doc. 49-2 (explaining that the registrar "ask[s] for a United States passport, Naturalization paper, or . . . birth certificate if [the applicants] were born abroad.").) Having a different process for applicants who were born abroad may discriminate on the basis of national origin in violation of the Equal Protection clause of the Fourteenth Amendment. Further, because only one parish is requesting documentation, voters may be facing discrimination based on their place of residence in violation of the Equal Protection Clause of the Fourteenth Amendment. Therefore, Plaintiffs' Equal Protection claims are fit for judicial review.

Plaintiffs' vagueness challenge only requires the Court to look to the text of the statute and does not require a factual inquiry in order to determine if the issue is fit for judicial review. *Deep S. Today v. Murrill*, 779 F. Supp. 3d 782, 800 (M.D. La. 2025) (deGravelles, J.). Plaintiffs are correct in arguing that Act 500 does not explain why proof of citizenship is necessary, what proof would satisfy the law, how the proof must be submitted, whether the proof of citizenship requirement applies to all methods of registration, when the proof must be submitted, or the consequences for submitting an application without proof of citizenship. Further, when claims concern a First Amendment right, as Plaintiffs' vagueness claim does, the threshold for ripeness is lowered. *Id.* (citing Wright & Miller, *supra*, at § 3532.3). Therefore, Plaintiffs' vagueness claim is also fit for judicial review.

Plaintiffs will suffer a hardship if review is withheld because of "practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [their] behavior in order to avoid future adverse consequences.'" *Choice Inc. of Tex.*, 691 F.3d at 715 (quoting *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (quoting *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998))). Plaintiffs are all voting advocacy organizations whose core missions are to ensure that eligible individuals have the opportunity and information needed to register to vote. Plaintiffs advance their missions by holding voter registration drives. Plaintiffs assert they cannot achieve their missions nor hold successful voter registration drives because of Act 500's proof of citizenship requirement (Doc. 61 at ¶¶ 20, 21, 25, 33, 38, 45–50, 54–57, 65, 68–69.). Therefore, Plaintiffs face practical harms to the interest they seek to advance because of Act 500's proof of citizenship requirement and Lafayette Parish's enforcement of it. Plaintiffs will also be forced to modify their behavior to comply with Act 500. Plaintiffs expect to spend more time and money educating volunteers, members, and the community about how to register to vote under Act 500's proof of citizenship requirement. (*Id.* at ¶¶ 26, 27, 51–52.) Plaintiffs will also need to purchase new equipment such as mobile scanners and printers to be able to successfully register voters at their voter registration events. (*Id.* at ¶¶ 24, 36, 53, 68.) Therefore, Plaintiffs will suffer hardship if review of their constitutional claims is withheld.

The Court finds Plaintiffs' constitutional claims to be ripe because the issues are fit for judicial review and Plaintiffs will suffer hardship if review is withheld. This part of Defendants' *MTD* is denied.

### 5. ***Sovereign Immunity***

a. <u>Parties' Arguments</u>

*1. Defendants' MTD (Doc. 86-1)*

Defendant Landry argues that sovereign immunity forecloses Plaintiffs' vagueness and Equal Protection claims against her. (Doc. 86-1 at 25.)[8] Further, the *Ex parte Young* exception does not apply because there is no "ongoing violation[] of federal law." (*Id.* (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022)).) If a state official has "neither enforced the challenged statute against anyone nor threatened to do so," there is no "ongoing conduct" sufficient to trigger *Ex parte Young*. (*Id.* (quoting *Mi Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024)).). Defendant Landry reads Plaintiffs' allegations to fault her only for her inaction, namely her failure to provide guidance on how to implement Act 500. (*Id.*) Therefore, there is no "ongoing conduct" sufficient to trigger the *Ex parte Young* exception and she can claim sovereign immunity. (*Id.* at 25–26.)

*2. Plaintiffs' Opposition (Doc. 91)*

Plaintiffs assert that the *Ex parte Young* exception does apply so Defendant Landry is not entitled to sovereign immunity. (Doc. 91 at 21.) Plaintiffs say Defendant Landry distorts the law by reading *Ex parte Young* to require an ongoing violation of federal law. (*Id.*) Rather, *Ex parte Young* allows federal courts to enjoin prospective unconstitutional conduct by officers of the state who are about to commence proceedings. (*Id.* (citing *Ex parte Young*, 209 U.S. 123, 155–56 (1908)).) "An 'actual threat of or imminent enforcement is not required,' only "*some* affirmative action on the part of the named defendant.'" (*Id.* at 22 (quoting *Mi Familia Vota*, 105 F.4th at 330–31 (emphasis in original)).) A "scintilla of enforcement by the relevant state official" is enough to

[8] Defendants also claimed that sovereign immunity foreclosed Plaintiffs' NVRA claims against Defendant Landry and the State Defendants. The Court does not address this argument, or Plaintiffs' reply, because the NVRA claims were dismissed for failure to provide sufficient notice under the NVRA.

trigger the *Ex parte Young* exception. (*Id.* (quoting *City of Aus. v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)).)

Plaintiffs argue a scintilla of enforcement exists. Defendant Landry (1) "has been coordinating with State and Federal agencies and non-governmental organizations to determine whether additional databases can be used to perform voter eligibility checks"; (2) has made multiple requests to the EAC requesting modifications to Louisiana's state-specific instructions on the Federal Form; (3) plans, based on the EAC's decision, to revise the State Form; and (4) issued "Interim Guidance for Implementation of Act 500." (Doc. 89-1 at ¶¶ 15, 17, 19-21, 23, 26-27.)

*3. Defendants' Reply (Doc. 99)*

Defendant Landry reasserts that she is entitled to sovereign immunity and that the narrow *Ex parte Young* exception does not apply. (Doc. 99 at 8–9.) Defendant again argues that if a complaint does not allege an ongoing violation of federal law and where the official has "neither enforced the challenged statute against anyone nor threatened to do so," the *Ex parte Young* exception is not triggered. (*Id.* at 9 (quoting *Mi Familia Vota*, 105 F.4th at 332).)

*4. Plaintiffs' Sur-Reply (Doc. 109)*

Plaintiffs do not address sovereign immunity in their *sur-reply*.

b. Applicable Law

"Under the Eleventh Amendment, '[f]ederal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it.'" *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025) (quoting *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014)); *accord Book People, Inc. v. Wong*, 91 F.4th 318, 334 (5th Cir. 2024). But under the *Ex parte Young* exception, "a plaintiff can seek prospective injunctive relief 'against

individual state officials acting in violation of federal law.'" *Book People*, 91 F.4th at 334 (quoting *City of Aus.*, 943 F.3d at 997); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (identifying "three criteria" for the exception).

In order for a state official to be a proper defendant pursuant to *Ex parte Young*, that official "'must have some connection with the enforcement of' the law being challenged." *Mi Familia Vota*, 105 F.4th at 325 (quoting *Ex parte Young*, 209 U.S. at 157). There are three "guideposts" which aid courts in making this determination. *Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). These are:

> (1) the state official has "more than the general duty to see that the laws of the state are implemented," *i.e.*, a "particular duty to enforce the statute in question"; (2) the state official has "a demonstrated willingness to exercise that duty"; and (3) the state official, through her conduct, "compel[s] or constrain[s persons] to obey the challenged law."

*Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672); *see also id.* at 325 n.7.

The above analysis is "provision-by-provision." *Id.* at 327. That is, the state official "must enforce 'the particular statutory provision that is the subject of the litigation.'" *Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). The Fifth Circuit has "defined 'enforcement' as 'typically involv[ing] compulsion or constraint,'" so if the state official "does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* at 332 (first quoting *City of Aus.*, 943 F.3d at 1000; and then quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Book People*, 91 F.4th at 335 (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)). "[D]irect enforcement . . . is not required." *Healthy Vision Ass'n*, 138 F.4th at 396 (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir.

2017)); *see also Mi Familia Vota*, 105 F.4th at 329 (requiring "'some scintilla' of affirmative action" demonstrating a state official's willingness to enforce the relevant statute). Lastly, the Fifth Circuit has often observed that "Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the [state] official under the *Ex parte Young* exception." *Book People*, 91 F.4th at 335 (cleaned up).

c. Analysis

The Court must determine whether Plaintiffs' 42 U.S.C. § 1983 claims against the Secretary of State in her official capacity are barred by the Eleventh Amendment. It is undisputed and clear from Plaintiffs' *Amended Complaint* that they are seeking prospective declaratory and injunctive relief for an ongoing violation of Plaintiffs' rights under the Fourteenth Amendment. (Doc. 61 at 46–47, 53–56.) Thus, the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity is implicated so long as Secretary of State Landry is a proper defendant and there is an adequate connection between her and the enforcement of Act 500, enacted as La. R.S. § 18:104(D).

First, the Court will look to the text of Louisiana Revised Statutes § 18:104 itself to determine whether Secretary of State Landry is the proper defendant in this matter. *See Book People, Inc.*, 91 F.4th at 335. The Louisiana Supreme Court has laid out the following guidelines for interpreting statutes:

> Legislation is the solemn expression of the legislative will; thus, the interpretation of legislation is primarily the search for the legislative intent. *Cat's Meow, Inc. v. City of New Orleans*, 98–0601 [ ] (La. 10/20/98)[;] 720 So. 2d 1186, 1198; *La. Safety Ass'n of Timbermen Self–Insurers Fund v. La. Ins. Guar. Ass'n*, 09–0023 [ ] (La. 6/26/09)[;] 17 So. 3d 350, 355–56. *See also* La. R.S. [§] 24:177(B)(1). When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. R.S. [§] 1:4. The starting point for interpretation of any statute is the language of the statute itself. *See, e.g., Cat's Meow*, [ ] 720 So. 2d at 1198; *Timbermen*, [ ]17 So. 3d at 356. Additionally, "all laws pertaining to the

> same subject matter must be interpreted in *pari materia*, or in reference to each other." *See, e.g., State v. Williams*, 10–1514 (La. 3/15/11)[;] 60 So. 3d 1189, 1191; La. [Civ. Code] art. 13. When, on the other hand, a statute is not clear and unambiguous, or its application leads to absurd consequences, we rely on secondary rules of statutory interpretation to discern the meaning of the statute at issue. *See Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.*, 10–0193 [ ] (La. 1/19/11)[;] 56 So. 3d 181, 187–88 (quotation omitted). In such cases, the statute "must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." *Id.*

*Pierce Founds., Inc. v. Jaroy Const., Inc.*, 2015-0785 (La. 5/3/16); 190 So. 3d 298, 303. Considering these guidelines, the Court finds that the Louisiana Legislature tasked the Secretary of State with enforcement of Louisiana Revised Statutes § 18:104(D). The statute says, "The secretary of state, subject to approval by the attorney general as to content, shall prescribe the form that shall be used uniformly by each registrar in the state and any person authorized to accept voter registration applications in registering qualified citizens to vote." La. R.S. § 18:104(A). Thus, because the Secretary of State is statutorily tasked with prescribing the form used for voter registration, Defendant Landry is a proper defendant.

Further, the Court finds that Defendant Landry is a proper defendant because she has the authority to enforce Louisiana Revised Statutes § 18:104(D). *See City of Aus.*, 943 F.3d at 998 ("Where no state official or agency is named in the statute in question, we consider whether the state official actually has the authority to enforce the challenged law."). The Secretary of State's powers and duties under Louisiana's Election Code include "administer[ing] the laws relating to . . . voter registration, and for this purpose [s]he shall . . . [d]irect and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters as provided by law . . . ." La. R.S. § 18:18(A)(2). Administering voter registration laws and "direct[ing]" local registrars "with respect to" matters relating to Louisiana's voter registration weigh heavily in favor of the

Secretary of State having statutory authority to enforce voter registration laws such as Louisiana Revised Statutes § 18:177(A)(1). As such, the Court finds that Louisiana's Secretary of State is a proper defendant in this matter and must next determine whether there is a sufficient connection between the Secretary of State and the actual enforcement of Louisiana Revised Statutes § 18:104(D).

It is clear from the specific actions taken by the Secretary of State that at the very least there is a scintilla of enforcement between the Secretary of State and Louisiana Revised Statutes § 18:104(D). By Defendant's own admission she "began her implementation by submitting a request to the EAC . . . asking that the Federal Form's Louisiana-specific instructions be amended to reflect Act 500's proof-of-citizenship requirement." (Doc. 86-1 at 10.) But Defendant did more than simply submit one request to the EAC. The initial submission on January 30, 2026, included two options for amending the instructions. (*Id.* at 11.) Defendant again contacted the EAC on February 24, 2025, to include additional requests for revision. (Doc. 46-4 at 5.) Then on May 17, 2025, Defendant asked the EAC to pause review so Louisiana could "submit additional evidentiary information." (*Id.*) While that communication paused part of the enforcement process—the EAC review—it demonstrates that enforcement work was still happening behind the scenes as Defendant Landry worked to gather evidence to support the enforcement of Act 500. Defendant unquestionably restarted the enforcement on June 25, 2025, when Louisiana asked the EAC to resume its review. (*Id.*) The EAC rejected Defendant's requested revisions on September 11, 2025. (Doc. 53 at 1.) Defendant could have stopped enforcement then but instead renewed the request to the EAC citing new information. (Doc. 58-1 at 3.) Defendant's numerous communications with the EAC and behind-the-scenes work to research and justify the need for Act 500 are enforcement actions sufficient to trigger the *Ex parte Young* exception.

Further, as Secretary of State, Defendant Landry has a duty to "direct and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters . . . ." La. R.S. § 18:18(A)(2). The Secretary of State must also "[p]rescribe uniform rules, regulations, forms, and instructions, which shall be . . . applied uniformly by each registrar of voters in the state." *Id.* § 18:18(A)(3). Taken together, these provisions describe the chain of command for carrying out voter registration laws. *Voice of the Experienced*, 2024 WL 2142991, at *18–19. Registrars' duty is ministerial in nature, and they must act at the direction of the Secretary of State. *Id.* Defendant Landry exercised her discretion when she was made aware of Lafayette Parish Registrar of Voters Office's enforcement of Act 500 and did not direct the parish to stop requesting proof of citizenship documentation, thereby ratifying the uneven treatment. *Bush v. Gore*, 531 U.S. 98, 107 (2000) (finding that a state supreme court acted unconstitutionally by ratifying the counties' unconstitutional recount procedures). Defendant Landry's decision to allow enforcement of Act 500 is itself an enforcement action sufficient to trigger the *Ex parte Young* exception.

For these reasons, the Court finds that Defendant Landry has a sufficient connection to Louisiana Revised Statutes § 18:104(D), and thus *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity applies. Therefore, Defendants' *MTD* with respect to this issue is denied.

### C. MTD: Pleading Challenges

#### ***1. Rule 12(b)(6) Standard***

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210 (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *MySpace, Inc.*, 528 F.3d at 418). The Court "do[es] not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [alleged misconduct].'" *Calhoun v. City of Hou. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

### 2. *Vagueness Claims*

#### a. Parties' Arguments

##### 1. *Defendants' MTD (Doc. 86-1)*

Defendants assert that Plaintiffs' vagueness claim "is a nonstarter" because the meaning of proof of citizenship in Act 500 "is obvious." (Doc. 86-1 at 27.) Defendants explain that

unconstitutional vagueness does not exist "merely because a company or anindividual can raise uncertainty about its application[.]" (*Id.* (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001)).) "'In the civil context' (like here) 'the statute must be so vague and indefinite as really to be no rule at all.'" (*Id.* (quoting *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020)).) Defendants claim their request to the EAC sufficiently explains what proof of citizenship means. (*Id.*; Doc. 46-2 at 2–3 ("your place of birth (State/Province, Country) and, if applicable, your unique immigration identifier (e.g. USCIS/Alien Registration Number; Form I-94, Arrival/Departure Recor, number; Student and Exchange Visitor Information System (SEVIS) ID number; Naturalization/Citizenship Certification Number; or Card Number/I-797 Receipt Number").)

Additionally, Defendants explain that "to be unconstitutionally vague, a statute must be impermissibly vague in all its applications, including its application to the party bringing the vagueness challenge." (Doc. 86-1 at 26 (quoting *United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023)).) Defendants point out that Plaintiffs cannot show vagueness as applied to themselves because, as organizations, they are ineligible to register to vote. (*Id.* at 27.) Therefore, Act 500 does not apply to Plaintiffs so they cannot bring a vagueness claim. (*Id.*)

2. *Plaintiffs' Opposition (Doc. 91)*

Plaintiffs explain that "[a] law is unconstitutionally vague if it (1) fails to provide those targeted by the statue a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." (Doc. 91 at 24 (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023)).) Further, they posit that, "standards of permissible statutory vagueness are strict in the area of free expression." (*Id.* at 24–25 (quoting *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 432

(1963)).) The stricter standard should apply because the First Amendment protects Plaintiffs' voter registration services. (*Id.* at 25 (citing *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 389 (5th Cir. 2013)).) Plaintiffs reject Defendants' contention that the request to the EAC sufficiently clarifies Act 500. (*Id.*) Plaintiffs point out that the EAC rejected the request so the proposed instructions do not and cannot explain what will be required of voter registration applicants. (*Id.*) Therefore, Plaintiffs' ability to provide voter registration services is hindered because they cannot adequately advise what Act 500 requires. (*Id.*)

Plaintiffs differentiate Act 500 from the statute at issue in *Texas Democratic Party v. Abbott*, 961 F.3d at 409. (*Id.*) They argue Act 500 is "so vague and indefinite as really to be no rule at all" because it does not explain what constitutes proof of citizenship or how applicants should submit proof of citizenship. (*Id.*)

*3. Defendants' Reply (Doc. 99)*

Defendants point to a recent case, *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 756–60 (5th Cir. 2026), in which the Fifth Circuit rejected a similar vagueness challenge to an election-integrity statute. (Doc. 99 at 10.) The Fifth Circuit stated that "divergent views at the margins of statutory applicability do not demonstrate that a provision is unconstitutionally vague in 'all of its applications.'" *La Union del Pueblo Entero*, 167 F.4th at 756 n.2 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)) (Doc. 99 at 10.) Defendants argue that any supposed uncertainty about how Act 500 may be implemented does not support a vagueness claim.

*4. Plaintiffs' Sur-Reply (Doc. 109)*

Plaintiffs allege that Act 500 is void for vagueness because additional proof of citizenship does not provide reasonable notice to applicants as to what is required to register to vote. (Doc.

109 at 6.) Plaintiffs point out that Defendants' own actions demonstrate that Act 500 is vague. (*Id.*) Defendant Landry has refused to provide guidance on Act 500 until her lawsuit against the EAC is resolved. (*Id.* at 6–7.) Meanwhile, Act 500 remains in effect, and Plaintiffs argue they cannot provide their voter registration services without knowing how to comply with Act 500's "vague mandates." (*Id.* at 7.)

b. <u>Applicable Law</u>

"[B]ecause we assume that [a person] is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited . . . . Vague laws may trap the innocent by not providing fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Equally important, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* Thus, a law "is void for vagueness if its prohibitions are not clearly defined." *Id.*; *accord McClelland*, 63 F.4th at 1013 ("A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926))).

"If . . . [a] law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Ests.*, 455 U.S. at 499. *See also Deep S. Today*, 779 F. Supp. 3d at 823–24 ("When a statute is capable of reaching [F]irst [A]mendment freedoms, the doctrine of vagueness 'demands a greater degree of specificity than in other contexts.'" (quoting *Kramer v. Price*, 712 F.2d 174, 177 (5th Cir. 1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974)))). The right of qualified voters to cast their votes effectively is protected by the First Amendment as part of the right of association. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).[9]

[9] Additional Supreme Court precedent has cast the right to vote in terms of expression. In *Wesberry v. Sanders*, the Court explained: "[N]o right is more precious in a free country than that of having a voice in the election of those who

c. Analysis

Act 500 raises First Amendment concerns because it impacts eligible voters' ability to successfully register in elections so they can effectively cast their votes. *See Williams*, 393 U.S. at 30. Therefore, a "more stringent vagueness test" applies. *Vill. of Hoffman Ests.*, 455 U.S. at 499. Having considered this test, the Court finds that Plaintiffs have plausibly alleged that Act 500 is unconstitutionally vague because it is unclear what documents can be used as proof of citizenship, how the proof must be submitted, whether the proof of citizenship requirement applies to all methods of registration, when the proof must be submitted, or the consequences for submitting an application without proof of citizenship. (Doc. 61 at ¶¶ 139–40.) Defendant Landry has not provided guidance on these issues to the public or to parish registrars. (*Id.* at ¶ 143.) Plaintiff League asked parish registrars for such guidance and was told there was no information to provide. (*Id.* at ¶ 144.) Additionally, the Lafayette Parish Register of Voters Office itself questioned what documents could be used to prove citizenship. (Doc. 49-2 at 2 (asking if a REAL ID is acceptable).) These allegations plausibly allege that Act 500 is unconstitutionally vague.

Defendants' references to *La Union del Pueblo Entero*, 167 F.4th 743, are inapplicable because of the differing procedural postures. The Fifth Circuit determined on appeal that the statute at issue was not unconstitutionally vague. *La Union del Pueblo Entero*, 167 F.4th at 756–60. Said differently, the Fifth Circuit considered the merits of the parties' claims. Because this is a motion to dismiss, the Court is "'to determine whether the plaintiff has stated a legally cognizable claim

make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). In *Reynolds v. Sims*, the Court held: "[E]ach citizen [must] have an equally effective voice in the election of members of his state legislature." *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). In *Norman v. Reed*, the Court noted that voting gives "opportunities of all voters to express their own political preferences." *Norman v. Reed*, 502 U.S. 279, 288 (1992). In *Anderson*, the Court held that the interest at stake was the "interests of voters who chose to associate together to express their support for Anderson's candidacy and the views he espoused." *Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983).

that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee*, 675 F.3d at 854 (quoting *Lone Star Fund V (U.S.), L.P.*, 594 F.3d at 387 (citing *Iqbal*, 556 U.S. at 678)).

The Court finds that Plaintiffs have plausibly alleged that Act 500 is unconstitutionally vague. Defendants' *MTD* regarding this issue is denied.

### ***3. Equal Protection Claims***

As an initial matter, the Parties' briefs on this issue are unorganized and provide little to no law to support their arguments.

a. Parties' Arguments

*1. Defendants' MTD (Doc. 86-1)*

Defendants argue that Plaintiffs' Equal Protection claims are meritless for three reasons: Section 1983 claims require action and Plaintiffs fault Defendant Landry for her inaction; Plaintiffs do not have prudential standing because they are not members of the suspect classes identified; and Plaintiffs' "conclusory accusations" misinterpret Defendant Meaux Menard's actions. (Doc. 86-1 at 28–29.)

Defendants contend that § 1983 claims require state action and Plaintiffs have not alleged any affirmative action taken by Defendant Landry. (*Id.* at 28.) Defendants point to *Lindke v. Freed*, 601 U.S. 187 (2024), and *Beltran v. City of El Paso*, 367 F.3d 299, 304 (5th Cir. 2004), to support their argument that §1983 requires action.

Second, Defendants claim that Plaintiffs do not have prudential standing to bring an Equal Protection claim because Plaintiffs have not alleged that they or any of their members are part of the suspect classes identified.[10] (*Id.*) In fact, Plaintiffs, as organizations, could not be members of

[10] The suspect classes at issue are (1) voter applicants who were born abroad and (2) voter applicants who apply to register to vote in Lafayette parish. Plaintiffs' Equal Protection claims are based on Lafayette Parish Registrar of Voters Office's request for proof of citizenship for applicants who were born abroad or who failed to check a box to confirm

the suspect classes. (Doc. 86-1 at 28 (citing *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 225 (5th Cir. 2019)).)

Finally, Defendants assert that Plaintiffs misinterpret Lafayette Parish's practices and urge the Court to look only to the exhibits, not the misleading "conclusory accusations" in Plaintiffs' pleadings. (*Id.* (quoting *Stockwell v. Kanan*, 442 F. App'x 911, 913 (5th Cir. 2011)).) Specifically, Defendants point to an email exchange with Defendant Meaux Menard. (*Id.* at 29 (citing Doc. 61-5).) Defendants acknowledge that the email details how Lafayette Parish requests proof of citizenship from some voter registration applicants, including those born abroad and those who fail to confirm they are United States citizens. (*Id.*) However, Defendants explain that Plaintiffs' allegations regarding the email are "fundamentally untrue, or at best, misleading" because the email also says that Lafayette Parish "processes the application" then sends a letter "advising the applicant of Act 500." (*Id.*) Defendants assert that sending a letter cannot be interpreted as requiring proof of citizenship or as discriminating based on national origin or residency. (*Id.*)

2. *Plaintiffs' Opposition (Doc. 91)*

To begin, Plaintiffs explain that Defendants misinterpret their Equal Protection claims. (Doc. 91 at 26.) Plaintiffs clarify they bring one claim based on disparate treatment of similarly situated voters based on parish of residence and one for discrimination based on national origin. (*Id.* at 26–27.) Plaintiffs claim that Defendant Landry's failure to provide clarity to the parish registrars as to how Act 500 will work in practice has led to disparate treatment of voters based on parish of residence. (*Id.* at 26.) Lafayette Parish has asked voter registration applicants for proof of citizenship while other parishes have not. (*Id.*) That same failure to provide guidance has led to

their citizenship. (Doc. 61 at ¶¶ 154–47.) Plaintiffs claim this practice discriminates based on national origin and place of residence. (*Id.* at ¶¶ 154, 158, 257.)

discrimination based on national origin because Lafayette Parish asks applicants who were born abroad to provide proof of citizenship. (*Id.*) Further, Defendant Landry has ratified the uneven treatment despite her awareness that it is ongoing and inconsistent with her own guidance. (*Id.*)

Plaintiffs then address Defendants' three arguments. First, Plaintiffs claim that Defendant Landry has taken action. By her own admission, Defendant Landry's office "has been working with executive staff, elections staff, and our legal team, to implement Act 500." (Doc. 66-2 at 12.) Plaintiffs assert that action has "fostered national origin discrimination and disparate treatment based on parish of residence." (Doc. 91 at 28.)

Second, Plaintiffs argue that Defendants are incorrect to say that Plaintiffs cannot state an Equal Protection claim unless they are part of a suspect class. (*Id.* at 27.) Plaintiffs explain that they themselves have suffered constitutional injuries because some of their members are part of the suspect class. (*Id.*)

Third, Plaintiffs claim that, when taking their well-pleaded allegations as true as the Court must at this stage, they have plausibly alleged discriminatory practices based on the email exchange with Defendant Meaux Menard. (*Id.*)

3. *Defendants' Reply (Doc. 99)*

Defendants briefly reassert their three arguments as to why Plaintiffs' Equal Protection claims fail: Plaintiffs have not identified action by Defendant Landry; Plaintiffs are not part of a suspect class; and Plaintiffs misinterpret Defendant Meaux Menard's actions. (Doc. 99 at 10–11.)

4. *Plaintiffs' Sur-Reply (Doc. 109)*

Plaintiffs do not address this issue in their *sur-reply*.

b. Applicable Law

*1. 42 U.S.C. § 1983*

"Section 1983 provides a private right of action for damages to individuals who are deprived of 'any rights, privileges, or immunities' protected by the Constitution or federal law by any 'person' acting under the color of state law." *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007) (quoting 42 U.S.C. § 1983). Equal Protection challenges may be brought under § 1983. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

*2. Prudential Standing*

Plaintiffs who bring an Equal Protection challenge under § 1983 must have prudential standing. As the United States Supreme Court has explained:

> The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citing *Barrows v. Jackson*, 346 U.S. 249 (1953)) . . . In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." [*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 471–72 (1982)]. Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright*, 468 U.S. 737, 751 (1984), are "founded in concern about the proper—and properly limited—role of the courts in a democratic society," *Warth v. Seldin*, [422 U.S. 490,] 498 [(1975)]; but unlike their constitutional counterparts, they can be modified or abrogated by Congress, [*see id.* at 501].

*Bennett v. Spear*, 520 U.S. 154, 162 (1997).

When bringing a claim on behalf of a third party, the Supreme Court has

> recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied: The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute, [*Singleton v. Wulff*, 428 U.S. 106, 112 (1976)]; the litigant must have a close relation to the third party, *id.*[ ] at 113–[ ]14; and there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.*[ ] at 115–[ ]16. *See also Craig v. Boren*, 429 U.S. 190 (1976).

*Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *see also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (citing *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004)) ("The rule for third-party standing requires the named plaintiff to have suffered an injury in fact and to share a 'close' relationship with third-parties who face an obstacle inhibiting them from bringing the claim on their own behalf.").

Moreover, a finding of third-party standing as to one plaintiff satisfies standing as to all plaintiffs. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs.*, 748 F.3d at 589 (citing *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Allandale Neighborhood Ass'n v. Aus. Transp. Study Pol'y Advisory Comm.*, 840 F.2d 258, 263 (5th Cir. 1988)) ("Because the physician-plaintiffs have third-party standing to assert the rights of their patients in this litigation, as well as standing to assert their own rights, we need not consider the issue of standing as it relates to the remaining plaintiffs." (footnote omitted)).

*3. Equal Protection*

The Supreme Court recognized two types of one-person, one-vote violations: one based on arbitrary and disparate treatment of voters, and one based on invidious discrimination. *League of United Latin Am. Citizens v. Abbott*, 951 F.3d 311, 317 (5th Cir. 2020). "[T]he Equal Protection Clause confers the substantive right to participate [in voting] on an equal basis with other qualified voters." *Lubin v. Panish*, 415 U.S. 709, 713 (1974). A state may not value one person's vote over another in an arbitrary and disparate manner. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665–67 (1966). If a citizen is otherwise qualified to vote, their place of residence should not impact that qualification. *Id.* at 667 (citing *Reynolds v. Sims*, 377 U.S. 533, 568 (1964)). Additionally, discriminating based on national origin is "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and

antipathy." *City of Cleburne, Tex. v. Cleburn Living Ctr.*, 473 U.S. 432, 440 (1985). Therefore, discrimination on the basis of national origin is subject to strict scrutiny and can only be sustained if narrowly tailored to achieve a compelling state interest. *Id.*

c. Analysis

*1. 42 U.S.C. § 1983*

Even assuming Defendants correctly presented the law in their brief, Defendants' argument that Plaintiffs have not stated a valid § 1983 claim because Defendants have taken action. Defendant Meaux Menard requested proof of citizenship documentation from a voter registration applicant who was born in Guatemala. (Doc. 49-2.) She further stated her office makes that request for any voters who were born abroad. (*Id.*) Defendant Landry ratified that unequal treatment by failing to instruct the Lafayette Parish Registrar of Voters to stop that practice. Therefore, both Defendants have taken action that could be interpreted as violating the Equal Protection clause, when construing that email in the light most favorable to Plaintiffs. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210.

*2. Prudential Standing*

As discussed above, Plaintiffs adequately alleged that League satisfies Article III standing, namely that its members suffered an injury in fact by showing that they are discriminated against on the basis of national origin and suffer disparate treatment in voting based on parish of residence because of Lafayette Parish's steps to enforce Act 500. Thus, League satisfies the first element of third-party standing set forth in *Powers*, 499 U.S. at 411.

Plaintiffs have also sufficiently alleged a close relationship with the third party, thus satisfying the second element in *Powers.*

> "The League works to ensure that all eligible individuals have the opportunity and the information needed to register and vote, with a particular focus on traditionally

> underrepresented and underserved communities who benefit the most from additional education and assistance, including voters of color, first-time voters, low-income voters, newly naturalized citizens, young voters, and voters impacted by the criminal legal system, including individuals with felony convictions seeking to register to vote after their rights have been restored."

(Doc. 61 at ¶ 13.) League accomplishes its mission by hosting multiple voter registration events annually. (*Id.* at ¶ 16.).

As to the final *Powers* element, whether the third parties suffer a hindrance that prevents them from suing on their own behalf, *Powers*, 499 U.S. at 411, Plaintiff League has adequately alleged a hindrance. Determining the existence of a hindrance requires examining "the likelihood and ability of the third parties . . . to assert their own rights." *Powers*, 499 U.S. at 414. Courts have found the following to constitute a hindrance that keeps a third party from protecting their own rights: deterrence from filing suit due to privacy concerns, imminent mootness of a case, or systemic practical challenges to pursuing one's own rights. *See Singleton*, 428 U.S. at 117 (allowing physicians to challenge a law excluding abortions from Medicaid coverage because women may be chilled from filing suit due to a desire to protect their privacy and because of the risk that the case would soon be moot); *Powers*, 499 U.S. at 414 (permitting criminal defendants to raise equal-protection challenges to race-based peremptory strikes due to the limited potential equitable relief, small financial stake, and cost of litigation, all of which keeps jurors from raising the claims themselves); *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208 (6th Cir. 2011) (collecting cases).

Plaintiff League can allege a hindrance based on privacy concerns and systematic practical challenges. A lawsuit involving one's citizenship status or national origin is an area of personal privacy that would deter individuals from bringing suit on their own behalf. Additionally, League's members, as "traditionally underrepresented and underserved communities," would face difficulty

bringing suit on their own because of the limited potential equitable relief, small financial stake, and cost of litigation. *Powers*, 499 U.S. at 414. (Doc. 61 at ¶ 13.) Therefore, the Court finds that the third party here suffers a hindrance to bringing the suit themselves, and the third *Powers* element is met.

All three *Powers* elements having been satisfied, the Court finds that League has established third-party standing. As such, all Plaintiffs have third-party standing. *See Planned Parenthood of Greater Tex. Surgical Health Servs.*, 748 F.3d at 589.

*3. Equal Protection*

Construing the complaint in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged violations of the Equal Protection Clause. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210 (citing *MySpace, Inc.*, 528 F.3d at 418). The parties do not disagree on the law at issue here. In fact, Defendants do not cite any law and only argue that Plaintiffs' interpretation of the facts is conclusory and misleading. (Doc. 86-1 at 28–29.) However, Plaintiffs advance a plausible interpretation of the facts.

Plaintiffs provide three exhibits to support their allegations of discrimination based on national origin and disparate treatment of voters based on place of residence. (Doc. 61-4; Doc. 61-5; Doc. 49-2.) The first is a letter that the Lafayette Parish Registrar of Voters office sends to voter registration applicants. (Doc. 61-4.) The letter states:

> Your voter registration application was received by our office and will be processed, due to Senate Bill 436, the bill mandates that applicants also provide documentary proof of U.S. citizenship when registering to vote.
>
> Acceptable evidence of U.S. citizenship includes a U.S. passport, a birth certificate (if born in the U.S.), a Certificate of Naturalization or Citizenship, or a Consular Report of Birth Abroad. For those born outside the U.S., a Certificate of Citizenship or Naturalization can be used to prove citizenship.
>
> You can either fax, email or mail us a copy of your proof of citizenship.

(*Id.* at 3.) The second is an email exchange explaining how Lafayette Parish uses that letter. (Doc. 61-5.) The email explains: "We still process the voter registration applications then send letters for [the applicants'] information. No one has been denied. Voters have been very forthcoming with their information." (*Id.* at 5.) The third exhibit is another email exchange from the Lafayette Parish Registrar of Voters office that explains how they process some voter registration applications: "We normally ask for a United States passport, Naturalization paper, or their birth certificate if they were born abroad." (Doc. 49-2 at 2.)

The simple fact that Lafayette Parish requests proof of citizenship with voter registration applications but other parishes do not is enough to plausibly allege arbitrary and disparate treatment of voters based on parish of residence. *Harper*, 383 U.S. at 665. Further, Lafayette Parish's own admission that they ask for proof of citizenship if an applicant was born abroad plausibly alleges discrimination based on national origin. If Lafayette Parish requested proof of citizenship from all applicants, they would have made a broader statement to that effect instead of explaining their practice for a specific set of applicants.

Defendants argue for a different interpretation of the exhibits. They make much of the fact that the voter registration applications are still processed. However, they do not explain what processed means. It is not clear from the emails that processing a voter registration application means the applicant is successfully registered to vote. Additionally, the letter that is sent to applicants, (Doc. 61-4), does not make absolutely clear that the application will be "processed" without proof of citizenship. (*Id.*)

One email does say "no one has been denied," but it also says "voters have been very forthcoming with their information." (Doc. 61-5 at 5.) It is plausible to interpret that as meaning no one has been denied because all applicants have provided their information. Once again, the

allegations must be construed in the light most favorable to Plaintiffs and so the Court accepts this plausible interpretation. *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 210 (citing *MySpace, Inc.*, 528 F.3d at 418).

Both of Plaintiffs' Equal Protection claims are "supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *City of Hou. Police Dep't*, 855 F. App'x at 919–20 (quoting *Twombly*, 550 U.S. at 556).

This part of Defendants' *MTD* is denied. The Court reiterates that it makes the ruling on this *Motion to Dismiss* with limited argument from the Parties and even less supporting caselaw. Indeed, the parties do not address the impact of *Louisiana v. Callais*, 608 U.S. 85 (2026), which was decided after the briefing of this motion, and which could (though not necessarily will) impact the outcome of this case. As will be explored in the next section, Plaintiffs will be given leave to amend their *Amended Complaint* to cure the deficiencies with the NVRA. Any such amendment should also address *Callais*, if appropriate.

## III. Leave to Amend

"Federal Rule of Civil Procedure 15(a) requires the trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.'" *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (quoting *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1162 (5th Cir. 1983)). "[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1995). In *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, the court said:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs

> advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

313 F.3d 305, 329 (5th Cir. 2002). Further:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

*JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018) (deGravelles, J.) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016)).

Thus, the Court will, in accordance with wise judicial practice, allow Plaintiffs leave to amend their *Amended Complaint* to cure the above deficiencies, if they can do so. *See Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing, *inter alia*, *Fetty v. La. State Bd. of Private Sec. Exam'rs*, 611 F. Supp. 3d 230, 250 (M.D. La. 2020) (deGravelles, J.)). However, Plaintiffs' counsel is reminded of their obligations under Federal Rule of Civil Procedure 11(b).

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that Defendants' *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)* (Doc. 86) is **GRANTED IN PART** and **DENIED IN PART**. With respect to Plaintiffs' NVRA claims—namely Defendants' arguments as to Plaintiffs' NVRA notice—the *Motion to Dismiss* is **GRANTED**, and Plaintiffs' NVRA claims are **DISMISSED WITHOUT PREJUDICE.** In all other respects, the *Motion to Dismiss* is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs shall have one hundred twenty-five (125)[11] days from the Court's ruling on Defendants' *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)* (Doc. 86) in which to cure the above deficiencies regarding their NVRA claims if same can, in good faith, be cured. If Plaintiffs fail to do so, all remaining deficient claims will be dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on September 30, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

[11] One hundred twenty-five (125) days allows Plaintiffs seven (7) days to send Defendants a new NVRA notice letter, wait the required ninety (90) days, and then file an amended complaint within twenty-eight (28) days.