**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

LEAGUE OF WOMEN VOTERS
OF LOUISIANA, ET AL.

CIVIL ACTION

VERSUS

25-413-JWD-SDJ

NANCY LANDRY, ET AL.

**CONSOLIDATED WITH**

LEAGUE OF WOMEN VOTERS
OF LOUISIANA, ET AL.
NATIONAL COUNCIL OF JEWISH
WOMEN, GREATER NEW ORLEANS CHAPTER

CIVIL ACTION

VERSUS

NO. 25-676-JWD-SDJ

NANCY LANDRY, ET AL.

# RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss Plaintiff's Complaint* ("*MTD*") (Doc. 98) filed by Defendants Nancy Landry and Charlene Meaux Menard (collectively, "Defendants"). Plaintiff National Council of Jewish Women, Greater New Orleans Chapter ("NCJW") opposes the motion. (Doc. 100.) Defendants have filed a reply. (Doc. 102; *see also* Doc. 103 (notifying the Court of a related lawsuit filed in the United States District Court for the Western District of Louisiana).) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Court will GRANT IN PART and DENY IN PART Defendants' *MTD*.

## TABLE OF CONTENTS

I. Preliminary Note ........ 2
II. Relevant Background ........ 2
  A. NVRA & Act 500 ........ 2

B. Factual Background .... 4
1. The Parties .... 4
2. The Dispute .... 4
3. Causes of Action .... 8
4. Prayer for Relief .... 9
C. Procedural Background .... 9
III. Discussion .... 10
A. Summary of Ruling .... 10
B. MTD: Jurisdictional Challenges .... 11
1. Rule 12(b)(1) Standard .... 11
2. NVRA Notice Requirement .... 13
3. Article III Standing .... 21
4. Ripeness .... 33
5. Sovereign Immunity .... 38
IV. Leave to Amend .... 45
V. Conclusion .... 46

## I. PRELIMINARY NOTE

This case, No. 25-676, is a member case of *League of Women Voters of Louisiana, et al. v. Landry, et al.*, No. 25-413. The cases were initially filed separately and then consolidated on January 15, 2026. (No. 25-676 Doc. 46; No. 25-413 Doc. 74.) References to Plaintiff's *Complaint* cite Doc. 1 and Doc. 2 in No. 25-676. All other cites to the record refer to No. 25-413.

The Court addressed a substantially similar motion to dismiss in *League of Women Voters of Louisiana* on October 1, 2026. No. 25-413, 2026 WL 2959966 (M.D. La. Oct. 1, 2026) (deGravelles, J.). The relevant background, discussion, and rulings are largely the same in both cases. However, there is one crucial difference in the complaints. NCJW's *Complaint* does not allege Equal Protection violations like League's *Amended Complaint* does, nor does it focus on Lafayette Parish's actions like League's does. For these reasons, this *MTD* ruling is different, namely on standing and ripeness grounds.

## II. RELEVANT BACKGROUND

### A. NVRA & Act 500

The NVRA, 52 U.S.C. § 20501 *et seq.*, allows registration via a "mail voter registration application form" ("Federal Form") or a state-developed equivalent ("State Form"). *See* 52 U.S.C. § 20505(a)(1)–(2). The Federal Form includes state-specific instructions, which "must be approved" by the Election Assistance Commission ("EAC"). *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5–6 (2013) [hereinafter *ITCA*]. The Federal Form "does not require documentary evidence of citizenship," just attestation, "under penalty of perjury, that [the applicant] is a citizen." *Id.* at 4–5; *accord* 52 U.S.C. § 20508(b)(1)–(2). The State Form "may require information the Federal Form does not." *ITCA*, 570 U.S. at 12. But the State Form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess" an applicant's eligibility to register to vote. 52 U.S.C. § 20508(b)(1).

Recently, Louisiana's Act 500 amended Louisiana Revised Statutes § 18:104 to require applicants for voter registration to "include with [their] application[s] proof of United States citizenship."[1] *See* La. R.S. § 18:104(D)(2). Louisiana was required to inform the EAC of this change. 11 C.F.R. § 9428.6(c). Louisiana (via Defendant Landry) therefore requested that the EAC approve revisions to the state-specific instructions included in the Federal Form. (Doc. 1 at ¶106.) As of January 2026, the EAC has rejected the requested options to amend the state-specific instructions. (Doc. 98-1 at 13.) "The State is evaluating its options in light of that decision." (*Id.*) "Louisiana still does not communicate any proof-of-citizenship requirement to prospective voters in any official documents or when accepting voter registration applications." (Doc. 1 at ¶ 93.) However, Lafayette Parish (via Defendant Meaux Menard) has already begun enforcing the documentary proof of citizenship requirement by asking at least one applicant for proof of citizenship. (*Id.* at ¶ 102.)

[1] Act 500 was enacted on January 1, 2025. 2024 La. Sess. Law Serv. Act 500 (S.B. 436).

### B. Factual Background[2]

#### *1. The Parties*

There are three parties involved in the motion before the Court: (1) NCJW; (2) Landry; and (3) Meaux Menard.

Plaintiff NCJW "is a nonprofit organization that works to improve the quality of life for women, children, and families, and safeguard individual rights and freedoms, consistent with Jewish values. Among those is the right to vote." (Doc. 1 at ¶ 13.) Voter registration assistance is one of NCJW's core services and Plaintiff regularly conducts voter registration drives as part of that work. (*Id.* at ¶¶ 16–17.) NCJW's members include qualified Louisiana voters, some of whom are not currently registered to vote so they would have to comply with Act 500 in order to register. (*Id.* at ¶ 25.)

Defendant Landry is Louisiana's Secretary of State and chief election officer. (*Id.* at ¶¶ 28–29.) As Secretary of State, Landry is statutorily tasked with the duty to "administer the laws relating to custody of voting machines and voter registration . . . ." La. R.S. § 18:18(A).

Defendant Meaux Menard is the Lafayette Parish Registrar of Voters. (*Id.* at ¶ 32.) As registrar she is responsible for voter registration and "for the administration and enforcement of the laws and the rules and regulations of the secretary of state." La. R.S. § 18:58.

#### *2. The Dispute*

Congress passed the NVRA, 52 U.S.C. § 20501 *et seq.*, because it recognized that "unfair registration laws" can "have a direct and damaging effect on voter participation." (Doc. 1 at ¶ 40

[2] The following factual allegations come primarily from the *Complaint* (Doc. 1) filed by Plaintiff. For purposes of Defendants' *MTD*, the Court accepts as true Plaintiff's well-pleaded factual allegations. *See, e.g.*, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (reciting the Rule 12(b)(1) standard); *Russell v. Choicepoint Servs., Inc.*, 302 F. Supp. 2d 654, 658 (E.D. La. 2004) (citing *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001)) ("Uncontroverted allegations . . . must be accepted as true.").

(quoting 52 U.S.C. § 20501(a)(3)).) Congress sought to improve access to the right to vote by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." (*Id.* (quoting 52 U.S.C. § 20501(b)(1)).) To achieve that goal, the NVRA directs the EAC to "develop a mail voter registration application form for elections for Federal office," 52 U.S.C. § 20508(a)(2), commonly known as the "Federal Form." (*Id.* at ¶¶ 41–42.) Congress stated that the Federal Form "may require only such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." (*Id.* at ¶ 42 (quoting 52 U.S.C. § 20508(b)(1)).) States may develop their own voter registration forms—the "State Form"—but the State Form may also only require information that is "necessary" to assess applicant eligibility. (*Id.* at ¶ 48 (citing 52 U.S.C. §§ 20505(a)(2), 20508(b)(1)).)

Congress considered and rejected proposals to allow states to require documentary proof of citizenship. (*Id.* at ¶ 61 (citing H.R. Rep. No. 103–66, at 23 (1993) (Conf. Rep.)).) Federal courts have held that other states' proof of citizenship requirements violated the NVRA. (*Id.* at ¶ 53.) The U.S. Supreme Court held that Arizona's proof of citizenship requirement violated the NVRA as applied to federal elections because the requirement was inconsistent with the NVRA's mandate that states accept and use the Federal Form. (*Id.* at ¶ 54 (citing *ITCA*, 570 U.S. at 1, 15).) Arizona tried again in 2022, this time requiring applicants using its State Form to provide proof of citizenship. (*Id.* at ¶ 55 (citing *Mi Familia Vota v. Fontes*, 129 F.4th 691, 705 (9th Cir. 2025)).) The Ninth Circuit struck down this law because it violated the NVRA by demanding more information than "'necessary' to assess an applicant's eligibility." (*Id.* at ¶ 58 (quoting *Mi Familia Vota*, 129 F.4th at 713).) The Tenth Circuit struck down a similar Kansas law, finding that it violated the NVRA and imposed an unconstitutional burden on the right to vote. (*Id.* at ¶ 59 (citing *Fish v.*

*Schwab*, 957 F.3d 1105, 1134 (10th Cir. 2020)).) Plaintiff asserts: "To date, no state (or the federal government) has successfully defended a proof of citizenship requirement on the merits in court."[3] (*Id.* at ¶ 62.)

Louisiana has developed a State Form that voter registration applicants can use in addition to the Federal Form. (*Id.* at ¶ 64 (citing La. Stat. Ann. § 18:115).) Prior to Act 500, the State Form only required applicants to attest, under penalty of perjury, that they are a United States citizen. (*Id.* (citing La. Stat. Ann. § 18:104).) Act 500 amended the election code to also require "each applicant [to] include with his application proof of United States citizenship." (*Id.* at ¶ 36 (quoting La. Stat. Ann. § 18:104(D)(2)).) Defendant Landry has not issued guidance on why proof is necessary, what documents can be used as proof of citizenship, how the proof must be submitted, whether the proof of citizenship requirement applies to all methods of registration, or what the penalty is for failure to comply. (*Id.* at ¶¶ 79, 91–92, 96–97, 230.) Nor does the legislative history offer any answers to these questions. (*Id.* at ¶¶ 83–90.) Plaintiff claims that because Defendant Landry has not explained why the proof is "necessary," Act 500 violates the attestation provision of Sections 6 and 9 of the NVRA, 52 U.S.C. §§ 20505(a)(1)–(2), 20508(b). (*Id.* at ¶¶ 167–76.) Plaintiff also claims that the failure to explain why the proof is "necessary" violates Section 5 of the NVRA, which provides that voter registration applications offered at state motor vehicle agencies "may require only the minimum information necessary to . . . enable state election officials to assess the eligibility of the applicant." (*Id.* at ¶¶ 197–202 (quoting 52 U.S.C. § 20504(c)(2)(B)(ii)).) Further, Plaintiff claims that Defendant Landry's failure to provide guidance on how to comply with Act 500 makes the law unconstitutionally vague in violation of Due Process and infringes upon a core First Amendment activity of voting. (*Id.* at ¶¶ 212–31.)

---

[3] Plaintiff does acknowledge a pending case challenging a New Hampshire law. *See N.H. Youth Movement v. Scanlan*, No. 1:24-cv-00291 (D.N.H. filed Sep. 17, 2024).

Plaintiff also argues that Act 500 violates the facial eligibility provision of Section 8 of the NVRA, 52 U.S.C. § 20507(a)(1). (*Id.* at ¶ 190.) Section 8 of the NVRA requires each state to "'ensure that any eligible applicant is registered to vote in an election' within a certain timeframe, depending on how they submitted their application." (*Id.* at ¶ 187 (quoting 52 U.S.C. § 20507(a)(1)).) A registrant demonstrates their eligibility by attesting to their citizenship. (*Id.* at ¶ 188.) "Under Section 8 of the NVRA, it is unlawful to deny registration to facially eligible applicants for failing to submit additional proof of citizenship beyond attestation." (*Id.* at ¶ 189.)

While Louisiana may develop a State Form, it is required to "accept and use" the Federal Form to register voters for federal elections. (*Id.* at ¶¶ 46, 64 (citing 52 U.S.C. §§ 20505(a)(1), 20508(b)(2)).) Further, according to Plaintiff, the Supreme Court has held that states cannot "requir[e] a Federal Form applicant to submit information beyond that required by the form itself." (*Id.* at ¶ 193 (citing *ITCA*, 570 U.S. at 20).) The Federal Form does not require proof of citizenship. (*Id.* at ¶ 194.) "To the extent [Act 500] requires individuals applying to vote via the Federal Form to provide proof of citizenship," it violates the NVRA. (*Id.* at ¶ 195.)

Additionally, the public agencies provision of the NVRA, 52 U.S.C. § 20506(a)(6), requires designated state agencies to offer voter registration using the Federal Form or its "equivalent." (*Id.* at ¶ 182.) Plaintiff claims that if the designated state agencies require voter registration applicants using their services to provide proof of citizenship, the state agencies will be in violation of Section 7 of the NVRA, 52 U.S.C. § 20506(a)(6). (*Id.* at ¶¶ 182–85.)

Finally, Plaintiff alleges a violation of the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 1010(a)(2)(B). (*Id.* at ¶¶ 204–11.) That provision

> prohibits individuals "acting under color of law" from denying anyone the right "to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or

> omission is not material in determining whether such individual is qualified under State law to vote in such election."

(*Id.* at ¶ 204 (quoting 52 U.S.C. § 10101(a)(2)(B)).) Defendant Landry has asked the EAC for permission to ask for "immigration identifier, place of birth, sex, and mother's maiden name" on the State and Federal Forms. (*Id.* at ¶ 208.) That information "is not material to whether an individual is qualified to vote." (*Id.* at ¶ 210.) If Louisiana refuses to register individuals who fail to provide that information, it will violate the Materiality Provision of the Civil Rights Act of 1964. (*Id.* at ¶¶ 204, 209.)

Plaintiff claims that Act 500 harms it in three main ways: diversion of resources; difficulties for voter registration events; and legal exposure. Plaintiff expects to spend more time and money educating volunteers, members, and the community about how to register to vote under Act 500's proof of citizenship requirement. (*Id.* at ¶¶ 18, 21.) Plaintiff does not currently have a way to scan or photocopy proof of citizenship. (*Id.* at ¶ 18.) Plaintiff claims it cannot carry out voter registration drives as effectively as it could before Act 500 was enacted. (*Id.* at ¶ 22.) Plaintiff will not be able to register voters at its current rate because many students who attend its voter registration events do not have proof of citizenship documentation, or if they do, they do not have access to the documents. (*Id.* at ¶¶ 19–20.) Finally, Plaintiff worries that it will face criminal consequences if it gets the law wrong when helping people register to vote. (*Id.* at ¶ 24.) "Louisiana law makes it a crime to knowingly, willfully, or intentionally 'misinform, directly or indirectly, any voter or prospective voter in matters concerning . . . voter registration.'" (*Id.* (citing La. Stat. Ann. § 18-1461.4(A)(1)).)

### 3. *Causes of Action*

Plaintiff asserts three causes of action. Counts I through V claim violations of the NVRA, 52 U.S.C. § 20501 *et seq.*, namely for violating the attestation, public agency, motor vehicle

agency, facial eligibility, and accept and use provisions. Plaintiff brings its NVRA claims against Defendant Landry only. Count VI alleges a violation of the materiality provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), pursuant to 42 U.S.C. § 1983. Count VI is brought against both Defendants. Count VII alleges a violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983. Count VII is brought against both Defendants.

#### *4. Prayer for Relief*

Plaintiff requests the Court to declare (1) "that SB 436 violates the National Voter Registration Act" (Doc. 1 at 43–44); (2) "that Louisiana's implementation of SB 436 through the requirement of additional information violates the Materiality Provision of the Civil Rights Act of 1964" (*Id.*); (3) "that SB 436 violates the First and Fourteenth Amendments to the U.S. Constitution" (*Id.*); and (4) "that all Louisiana citizens who registered to vote using the existing State and Federal Forms after January 1, 2025, are lawfully registered." (*Id.*) Moreover, Plaintiff requests the Court to enjoin Defendants (1) "from enforcing SB 436's proof-of-citizenship requirement" (*Id.*); and (2) "from rejecting or refus[ing] to accept a voter registration application due to missing immigration identifier, birthplace, sex or mother's maiden name." (*Id.* at 45.) Lastly, Plaintiff requests costs, disbursements, and reasonable attorneys' fees and any other relief the Court deems just and proper. (*Id.*)

### C. Procedural Background

Act 500 was enacted on January 1, 2025. 2024 La. Sess. Law Serv. Act 500 (S.B. 436). Also in January 2025, Louisiana (via Defendant Landry) requested that the EAC consider revisions to the state-specific instructions included in the Federal Form. (Doc. 98-1 at 11.) Throughout 2025, Louisiana modified its request to the EAC multiple times. (*Id.* at 11–12.) Ultimately, in January 2026, the EAC rejected the requested options to amend the state-specific instructions. (Doc. 98-1

at 13.) Following that decision, the State of Louisiana and Defendant Landry filed suit against the EAC on April 14, 2026. (Doc. 103 at 1 (citing *State of La. v. U.S. Election Assistance Comm'n*, No. 3:26-cv-01191 (W.D. La. 2026)[4]).)

To comply with the NVRA's notice requirement, *see* 52 U.S.C. § 20510(b)(1)–(2), Plaintiff sent a letter to Defendant Landry on May 2, 2025, notifying her that Act 500's requirement of documentary proof of citizenship to register and vote violates the NVRA. (Doc. 2.) On August 1, 2025, Plaintiff filed its *Complaint*, (Doc. 1), alleging violations of the First and Fourteenth Amendments, Sections 6, 7, 8, and 9 of the NVRA, 52 U.S.C. §§ 20505–20508, and the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101. This action was consolidated with a substantially similar case, Civil Action No. 25-413-JWD-SDJ, on January 15, 2026. (Doc. 46.) On February 27, 2026, Defendants filed this *MTD*. (Doc. 98.)

## III. Discussion

### A. Summary of Ruling

Defendants filed their *MTD* pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim. (Doc. 98.) Regarding Defendants' 12(b)(1) argument, Defendants assert that Plaintiff's suit must be dismissed because (1) Plaintiff failed to comply with the NVRA's notice requirement; (2) Plaintiff lacks standing; (3) Plaintiff's claims are not ripe; and (4) Defendant Landry has sovereign immunity. (Doc. 98-1 at 2.) With respect to Defendants' 12(b)(6) argument, Defendants assert that (1) Plaintiff has not adequately pled a vagueness claim; (2) Plaintiff has not adequately pled a Civil Rights Act claim; and (3) Plaintiff has not adequately pled NVRA claims. (*Id.* at 2–3.) In short, the Court will grant in part and deny in part Defendants' *MTD*.

[4] This lawsuit is still pending. The EAC only recently filed its answer on August 17, 2026.

The Court finds that with regard to Defendants' NVRA notice arguments, the *MTD* is granted because the May 2, 2025 letter did not contain any existing violations of the NVRA. Therefore, the NVRA claims, Counts I–V are dismissed without prejudice.

With respect to Defendants' Article III standing argument, the Court finds Plaintiff does not have Article III standing under recent Fifth Circuit precedent. With respect to this issue, Defendants' *MTD* is granted and Counts VI and VII are dismissed without prejudice.

Regarding Defendants' ripeness arguments, the Court finds Plaintiff's vagueness claim to be ripe because Defendant Landry has not provided guidance on Act 500's vague terms. Consequently, the *MTD* is denied. However, the Court finds Plaintiff's Civil Rights Act claim is not ripe because the claim is based on hypothetical future events—namely, no voter has been denied the right to vote for failure to provide proof of citizenship. The *MTD* is granted and Count VI is dismissed without prejudice.

With respect to Defendants' sovereign immunity arguments, the *MTD* is denied. The Court finds there to be a scintilla of enforcement activity ongoing by the Secretary of State to trigger the *Ex parte Young* exception to sovereign immunity.

Finally, the Court will not address Defendants' 12(b)(6) arguments because all claims were dismissed for lack of subject matter jurisdiction.

Further, the Court will grant Plaintiff leave to amend to address the above-mentioned deficiencies if same can be cured in good faith.

**B. MTD: Jurisdictional Challenges**

***1. Rule 12(b)(1) Standard***

A party may raise the defense of lack of subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional

power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)); *accord Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010.

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). Relevant here, "[a] facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Paterson*, 644 F.2d at 523. "If those jurisdictional allegations are sufficient the complaint stands." *Id.*

On the other hand, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (quoting *Mortensen v. First*

*Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "[N]o presumptive truthfulness attaches to [the] plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Mortensen*, 549 F.2d at 891). Given a factual attack, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

### ***2. NVRA Notice Requirement***

a. Parties' Arguments

1. *Defendants' MTD (Doc. 98-1)*

Defendants acknowledge that Plaintiff sent Defendant Landry a letter on May 2, 2025 that Plaintiff "calls an NVRA notice." (Doc. 98-1 at 23–24 (quoting Doc. 2).) The letter warned Defendant, "[i]f you enforce SB 436 . . . you will violate Sections 5, 6, 7, 8, and 9 of the NVRA." (*Id.* (quoting Doc. 2 at 4).) However, Defendants argue that Secretary Landry had not taken any action to enforce Act 500 as of the time the letter was sent, so there was no violation to correct. (*Id.* at 24.) Defendant Landry's only action was to request EAC approval to amend the Federal Form's Louisiana-specific instructions. (*Id.*; Doc. 30-3.) Defendants do not view that request as an enforcement action. Therefore, Defendants argue, there was no violation and thus "no requisite notice that could constitute the exhaustion required before a plaintiff files an NVRA suit." (Doc. 98-1 at 24.)

2. *Plaintiff's Opposition (Doc. 100)*

Plaintiff claims its May 2, 2025 letter "explained in detail" how Act 500's proof of citizenship requirement violated the NVRA. (Doc. 100 at 24 (citing Doc. 2 at 3).) Therefore, the letter "was plainly sufficient to provide [Defendant Landry] 'the opportunity to cure any potential

violation before litigation ensues.'" (*Id.* (quoting *Voice of the Experienced v. Ardoin*, No. 23-331, 2025 WL 2977060, at *30 (M.D. La. Oct. 21, 2025) (deGravelles, J.)).) Plaintiff argues it is enough that Act 500 was in effect when the letter was sent; the letter did not need to "'provide a detailed explanation' of an underlying violation." (*Id.* (quoting *Green v. Bell*, No. 21-493, 2023 WL 2572210, at *3 (W.D.N.C. Mar. 20, 2023)).) Plaintiff gave Defendant Landry enough information to understand that requiring proof of citizenship "ran afoul [of] the NVRA." (*Id.*) Finally, Plaintiff claims that insufficient notice usually exists when a "plaintiff fail[s] to provide any notice at all." (*Id.* (quoting *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1010 (D. Alaska 2023)).)

*3. Defendants' Reply (Doc. 102)*

Defendants claim the May 2, 2025 letter was insufficient because it did not provide notice of an actual NVRA violation. (Doc. 102 at 6.) The letter only warned that future enforcement would violate the NVRA, and the statute requires more than a warning about a "hypothetical future violation." (*Id.* at 6–7.)

Defendants argue that the cases Plaintiff cited are inapplicable. (*Id.* at 7.)

> In each, the official received notice of an identified *ongoing* NVRA violation. *See Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1008 (D. Alaska 2023) (notice "for failure to permit inspection and reproduction of public records" "[f]our days" earlier); *Green v. Bell*, No. 3:21-CV-00493-RJC-DCK, 2023 WL 2572210, at *3 (W.D.N.C. Mar. 20, 2023) (notice officials "*are violating* Section 8" (emphasis added)).

(*Id.*) Defendants find that distinction important because "Congress structured the notice requirement in such a way that notice should provide . . . an opportunity to attempt compliance before facing litigation." (*Id.* (quoting *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 794 (W.D. Tex. 2015)).)

b. Applicable Law

Under 52 U.S.C. § 20510(b),

> (1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.
> (2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.
> (3) If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

"The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Ga. State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012) (citing *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997)). In relation to this purpose, "courts have found that an NVRA notice is sufficient if it 'sets forth the reasons for [the] conclusion' that a defendant failed to comply with the NVRA, and, when 'read as a whole, [it] makes it clear that [the plaintiff] is asserting a violation of the NVRA and plans to initiate litigation if its concerns are not addressed in a timely manner.'" *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1348 (N.D. Ga. 2016) (alterations in original) (quoting *Judicial Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012)). "[N]otice as to one potential NVRA violation is not the equivalent of notice as to all potential NVRA violations." *Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1334 (S.D. Fla. 2017). "Rather, a potential NVRA defendant must have notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Id.*

Notice is mandatory. *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014). The NVRA provides that "[i]f the violation is not corrected within 90 days after receipt of [the] notice . . . the aggrieved person may bring a civil action in an appropriate district court for declaratory or

injunctive relief with respect to the violation." 52 U.S.C. § 20510(b)(2). "No standing is therefore conferred if no proper notice is given, since the 90–day period never runs." *Scott*, 771 F.3d at 835 (quoting *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335).

c. Analysis

To determine what NVRA violations Plaintiff gave the Defendants notice of, the Court must look to the language of the May 2, 2025 letter. Again, the purpose of a notice letter is to alert the Defendants of exactly what NVRA violation has occurred so they have an opportunity to cure such violation before litigation ensues. *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335. Plaintiff's letter explains how enforcement of Act 500 *would* violate various provisions of the NVRA. (Doc. 2 (citing 52 U.S.C. §§ 20504–20508).) It details how Act 500 *could* be interpreted to violate the NVRA and explains that *if* Act 500 is enforced in the manner Plaintiff envisions, it will violate the NVRA. (*Id.* at 5.) However, the letter does not complain of specific actions Defendant Landry took. It states that Act 500 "requires the Louisiana Secretary of State to change the form that voters use to register to vote," but it does not allege that Defendant Landry has already changed the form.[5] (*Id.* at 2.) The letter seems to be asking Secretary Landry to do nothing or risk violation, instead of explaining what she did that was a violation.

The speculative statements in the letter do not provide Defendants "the opportunity to attempt compliance" before facing litigation because the statements do not describe any actions Defendants could stop, nor do they give "notice of exactly what violation or violations have been alleged in order to have a meaningful opportunity to attempt complete compliance before facing litigation." *Ga. State Conf. of NAACP*, 841 F. Supp. 2d at 1335; *Bellitto*, 268 F. Supp. 3d at 1334. The letter only explains why the law will violate the NVRA if enforced. Courts generally require

[5] Landry represents in briefing that she has not updated the form as the EAC has rejected her requests to do so. (Doc. 98-1 at 13.) "The State is evaluating its options in light of that decision." (*Id.*)

NVRA notice letters to detail specific violative acts in order for the letter to constitute sufficient notice. *Scott*, 771 F.3d at 840; *Voice of the Experienced v. Ardoin*, No. 23-331, 2024 WL 2142991, at *31–32 (M.D. La. May 13, 2024) (deGravelles, J.); *Georgia State Conf. of NAACP*, 841 F. Supp. 2d at 1333–34; *Project Vote, Inc.*, 208 F. Supp. 3d at 1348; *League of Women Voters of La. v. Landry*, No. 25-413, 2026 WL 2959966, at *9–12 (M.D. La. Oct. 1, 2026) (deGravelles, J.). "It is not enough that a potential NVRA defendant has general notice that an individual or organization believes it to be in violation of the NVRA before facing litigation." *Bellitto*, 268 F. Supp. 3d at 1334.

The Fifth Circuit upheld the district court's determination that plaintiff's letter complied with the NVRA notice requirement in *Scott*, 771 F.3d at 840. The letter in that case explained that defendants violated the NVRA by failing to provide voter registration applications to numerous individuals. Complaint ¶ 85, *Scott v. Schedler*, 2011 WL 11901085 (E.D. La. Feb. 22, 2016) (No. 11 Civ. 926), *aff'd in part*, 771 F.3d 831, 840 (5th Cir. 2014). The letter provided specific instances of violations and asked the defendants to develop a plan to remedy those violations. *Id.* at ¶¶ 86–87. Therefore, the district court and the Fifth Circuit found the letter to be sufficient NVRA notice. *Scott*, 771 F.3d at 840.

In *Voice of the Experienced v. Ardoin*, this Court found sufficient plaintiffs' letter detailing specific instances of parish registrars requiring documentation in violation of the NVRA. *Voice of the Experienced*, 2024 WL 2142991, at *31–32. Plaintiffs' letter in that case detailed how parish registrars were applying an outdated interpretation of the law and wrongly requiring formerly incarcerated persons to provide proof that they were no longer under an order of imprisonment. Complaint, Ex. 1, *Voice of the Experienced v. Ardoin*, 2024 WL 2142991 (M.D. La. May 13, 2024) (No. 23 Civ. 331). The letter explained that Louisiana election law had recently changed to remove

the documentation requirement. *Id.* It went on to explain that the requests for documentation not only violated the new Louisiana law, but also the NVRA. *Id.* Finally, the letter asked the Secretary of State, the defendant, to issue guidance to all parishes on the new law. *Id.* As a whole, the letter detailed a specific instance of a violation and asked the defendant to take action to correct the violation.

In *Georgia State Conference of NAACP v. Kemp*, the court found sufficient a letter that explained actions Georgia took that violated the NVRA. *Georgia State Conf. of NAACP*, 841 F. Supp. 2d at 1333–34. The letter alleged that Georgia systematically failed to provide voter registration services in violation of the NVRA. *Id.* at 1334. To support that general allegation, plaintiffs provided results from a survey they conducted in which they visited various voter registration offices to test the sufficiency of the services. *Id.* Plaintiffs provided detailed statistics about the offices' performance. *Id.* The court thought the inclusion of those statistics was compelling and found the letter to be adequate. *Id.*

The sufficient letter in *Project Vote, Inc. v. Kemp* described five detailed ways Georgia failed to respond to a records request in violation of the NVRA. *Project Vote Inc.*, 208 F. Supp. 3d at 1347–48. The letter went on to clearly state an affirmative action for Georgia to take to comply with the NVRA—namely, to provide the requested records. *Id.* at 1348. Because the letter described a violation and explained steps the defendants could take to remedy the violation, the court found the letter to be sufficient NVRA notice. *Id.* at 1347–48.

Plaintiff's letter in this case is unlike any of those letters. First, the letter does not point to specific conduct taken by Defendant Landry, like in *Scott* or *Voice of the Experienced*. Plaintiff's letter only explains in general terms how Plaintiff thinks Act 500 itself violates the NVRA. Second, Plaintiff's general allegation of an NVRA violation is not supported by any statistics or specific

examples like in *Georgia State Conference of NAACP*. Plaintiffs in that case also made a general allegation, but they backed it up with data. While Plaintiff is not required to conduct a survey or provide detailed specifics, it is required to provide at least one instance of a specific action Defendant Landry took in violation of the NVRA. Third, the letter does not ask Defendant Landry to take any action, like the letters in *Voice of the Experienced* and *Project Vote* did. In fact, the letter asks Defendant Landry not to take action because taking action to enforce Act 500 could lead to an NVRA violation. Because Plaintiff's letter does not provide details of a specific action that Defendant took constituting an NVRA violation, it does not constitute sufficient notice under the NVRA.

In one case the court found a letter to constitute sufficient notice even though it did not detail a specific violation. *Judicial Watch, Inc.*, 993 F. Supp. 2d at 922. Like the letter at issue in this case, the letter in *Judicial Watch* did not provide details about an alleged NVRA violation but spoke only of "an apparent violation" and used language such as "we believe." *Id.* Nevertheless, the court found the letter sufficient because of the specific NVRA provision at issue, 52 U.S.C. § 20507(a)(4). *Id.* That provision does not contain detailed requirements; it only requires "reasonable efforts," so the court did not think the letter needed to contain detailed allegations of violations. *Id.* Unlike *Judicial Watch*, Plaintiff does not allege a violation of 52 U.S.C. § 20507(a)(4). None of the provisions that Plaintiff alleges violations of require "reasonable efforts." Therefore, *Judicial Watch* is inapplicable.

Defendants correctly differentiate the two cases Plaintiff provides to argue its letter is sufficient. In *Public Interest Legal Foundation v. Dahlstrom*, the plaintiff requested information about deceased voters on Alaska's voter registration lists. *Pub. Int. Legal Found. Inc.*, 673 F. Supp. 3d at 1007. Alaska responded, providing some of the information but not all of it. *Id.* at 1008.

Plaintiff then sent an NVRA notice letter "for failure to permit inspection and reproduction of public records as required by the NVRA, 52 U.S.C. § 20507(i)(1)." *Id.* The letter asked Alaska to provide the missing information or face litigation. *Id.* Defendant argued the letter was not detailed enough but the court explained, "[w]hen courts have found notice to be insufficient, it typically is because the plaintiff failed to provide any notice at all." *Id.* at 1010. The court found the letter to be sufficient because it "adequately apprised [defendant] of the alleged NVRA violation" and "clearly communicated that [plaintiff was] asserting a violation of the NVRA and intended to commence litigation if the violation [was] not timely addressed." *Id.* at 1011.

The letter in *Public Interest Legal Foundation*, like the letters in *Scott*, *Voice of the Experienced*, *Georgia State Conference of NAACP*, and *Project Vote*, points to a specific violation by defendant and asks defendant to take action to remedy the violation. Again, the letter in this case only explains why Act 500 itself may violate the NVRA. The letter does not point to any action Defendant Landry took that violated the NVRA.

*Green v. Bell* also involved requests for voter roll information. *Green*, 2023 WL 2572210, at *2–3. Plaintiffs sent a letter explaining that North Carolina failed to provide accurate voter rolls, in violation of the NVRA. *Id.* at *3. The defendant argued the letter was insufficient because it did not provide a detailed explanation of how she was violating the law. *Id.* Nevertheless, the court found the letter to be sufficient because it announced a violation of the statue. *Id.* at *3 (citing *Georgia State Conf. of NAACP*, 841 F. Supp. 2d at 1334). The court did not require the letter to "provide a detailed explanation of *how* [defendant] was violating the law," only that defendant had caused a violation. *Id.* at *3 (emphasis added).

The problem with the letter in this case is not its failure to explain how Defendants' actions caused a violation. The problem, once again, is its failure to explain that the Defendants' actions

caused a violation. Further, the letter in *Green* pointed to an ongoing violation by "North Carolina and [thirty-six] counties" for failure to "maintain accurate voter rolls." *Id.* at *1, 3. The letter in this case does not point to an ongoing violation by Defendant Landry; it only explains how Act 500 could violate the NVRA. *Green v. Bell* is inapplicable and differentiable. Plaintiff's NVRA notice letter is insufficient.

Nothing in the law prevents Plaintiff from amending its complaint after sending a new, sufficient NVRA notice letter, assuming Defendants fail to remedy the violation within 90 days. *See Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 644–45 (M.D. La. 2025) (deGravelles, J.); *League of Women Voters of La.*, 2026 WL 2959966, at *11 (allowing plaintiffs to amend their complaint, which was originally filed before plaintiffs sent an NVRA notice letter, to include the later-filed notice letter and reassert their NVRA claims).

For these reasons, the Court finds that Plaintiff did not satisfy the NVRA's notice requirement. Therefore, Defendants' *MTD* with respect to this issue is granted, and all NVRA claims are dismissed without prejudice.

### ***3. Article III Standing***

#### a. <u>Parties' Arguments</u>

##### *1. <u>Defendants' MTD (Doc. 98-1)</u>*

Defendants maintain that Plaintiff bears the burden of establishing standing by showing it has suffered an injury in fact, that is fairly traceable to the challenged conduct of the defendant, and that is likely to be redressed by a favorable judicial decision. (Doc. 98-1 at 17 (citing *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).) An organization may have standing by showing it can sue on behalf of its members (associational standing) or it can sue in its own right (organizational standing). (*Id.* (citing *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 285 (5th Cir. 2025)).) Defendants cite *Hunt v. Washington State*

*Apple Advertising Commission*, 432 U.S. 333, 343 (1977), to explain that associational standing requires a plaintiff organization to show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Id.* at 20.) Defendants state that "[o]rganizations suing on their own behalf 'must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals.'" (*Id.* at 18 (citing *La Union Del Pueblo Entero*, 151 F.4th at 285 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024))).) Defendants claim that Plaintiff does not have standing under either theory. (*Id.*)

Defendants dispute Plaintiff's arguments that it has associational standing. (*Id.* at 20.) Defendants claim the alleged member injury is too speculative and not traceable to Defendants. (*Id.*) Defendants view the alleged member injury to be the time and cost of obtaining proof of citizenship so members can register to vote, assuming members do not already have proof and are not currently registered to vote. (*Id.* at 20–21.) According to Defendants, Plaintiff has not alleged that a member has suffered such an injury, and even if it had, Defendants and Act 500 are not responsible for the difficulties in obtaining proof of citizenship. (*Id.* at 21.) Therefore, Defendants argue, Plaintiff does not have associational standing because none of its members have standing.

Defendants also argue that Plaintiff lacks organizational standing because it has not suffered an injury. (*Id.* at 18.) According to Defendants, Plaintiff's organizational standing theories are insufficient under *Alliance for Hippocratic Medicine*, 602 U.S. at 393–94, because plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." (*Id.* (quoting *La Union Del Pueblo Entero*, 151 F.4th at 285).) Defendants explain that "[o]nly in the rarest cases can organizations

demonstrate standing by showing a defendant's action interferes with their activities." (*Id.* (quoting *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 318 (5th Cir. 2025)).) Defendants contend this is not one of those rare cases. (*Id.*)

Defendants reject Plaintiff's argument that diversion of resources is a cognizable Article III injury. (*Id.*) Defendants state that the diversion of resources is self-inflicted because Act 500 does not require Plaintiff to adjust its operations. (*Id.*) Defendants also reject Plaintiff's argument that mission frustration and difficulties holding registration events are cognizable Article III injuries. (*Id.* at 19.) Defendants cite *Deep South Center for Environmental Justice*, 138 F.4th at 319, to support their argument: "Even if [the law] 'makes it more difficult' for [Plaintiff] to achieve its mission . . . that is not the kind of impediment *Alliance* requires." (*Id.*) Finally, Defendants do not take seriously Plaintiff's contention that its volunteers will face criminal consequences. (*Id.* at 19 (citing Doc. 1 at ¶ 24; La. R.S. 18:1461.4(A)(1)).) Defendants point out that statute covers "knowingly, willfully, or intentionally" "intimidat[ing], deceiv[ing], or misinform[ing]" a "prospective voter in matters concerning voting or nonvoting or voter registration or nonregistration, or the signing or not signing of a petition." (*Id.* (quoting La. R.S. 18:1461.4(A)(1)).) They argue that statute is inapplicable and any prosecution would be done by the district attorney, not Defendants. (*Id.*) Therefore, because Plaintiff has not suffered injury, it does not have organizational standing. (*Id.* at 18.)

2. *Plaintiff's Opposition (Doc. 100)*

Plaintiff argues it has adequately alleged associational and organizational standing. (*Id.* at 15.) Plaintiff agrees with Defendants that *Washington State Apple Advertising Commission*, 432 U.S. at 343, defines the requirements for associational standing. (*Id.* at 19.) Plaintiff disagrees with Defendants about its members having standing to sue in their own right. (*Id.*) Plaintiff alleges its

members are harmed because they "must navigate [Act 500's] vague terms" when registering to vote. (*Id.*) Further, some members do not have proof of citizenship documents or would face heavy burdens to get them. (*Id.* at 19–20.) Plaintiff argues that it does not have to name a specific member who suffered such injury to establish associational standing. (*Id.* at 20–21.) Also, Plaintiff explains, the injury is traceable to Defendants because they are responsible for enforcing Act 500's proof of citizenship requirement. (*Id.* at 21.) Plaintiff concludes, because Plaintiff's members would have standing to sue, Plaintiff has sufficiently pled associational standing. (*Id.* at 19.)

Plaintiff claims it also has organizational standing because "an organization has standing to challenge actions that 'directly affect[] and interfere[]' with its 'core business activities.'" (*Id.* at 16 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395).) Act 500 allegedly impedes Plaintiff's ability to provide effective and efficient voter registration services, one of its core services. (*Id.* at 16–17.) Plaintiff argues that harm is substantial enough under Article III. (*Id.* at 17 (citing *Voice of the Experienced*, 813 F. Supp. 3d at 638–42).) Plaintiff disagrees with Defendants that the injury is self-inflicted because "Plaintiff must confront the new requirement to provide voter registration services at all." (*Id.* at 18.)

Finally, Plaintiff argues the threat of criminal prosecution is serious. (*Id.*) Plaintiff agrees with Defendants that Louisiana law makes it a crime to "knowingly, willfully, or intentionally" misinform a "prospective voter in matters concerning voting or nonvoting or voter registration or nonregistration, or the signing or not signing of a petition." (*Id.* (quoting La. R.S. 18:1461.4(A)(1)).) If Plaintiff had registered voters in Lafayette Parish and informed them that they did not have to provide proof of citizenship, Plaintiff would have misinformed those applicants because Defendant Meaux Menard has required such information. (*Id.*) "Plaintiff and its volunteers will not bet their future over a criminal statute's broad *mens rea* requirement." (*Id.*)

*3. Defendants' Reply (Doc. 102)*

Defendants repeat the same arguments as in their *MTD*. They argue that Plaintiff does not have associational standing because it has not alleged that at least one member would have standing to sue in their own right. (Doc. 102 at 4.) Then they argue that Plaintiff does not have organizational standing because the organization itself has not suffered a cognizable injury. (*Id.* at 2–3.) Defendants argue that diversion of resources is not a cognizable injury because the challenged law "neither prevents [it] from engaging in its advocacy, education, and training activities nor compels it to take any action." (*Id.* at 3 (quoting *Deep S. Ctr. for Env't Just.*, 138 F.4th at 319–20; *accord La Union del Pueblo Entero v. Abbott*, 151 F.4th at 287).) Defendants also reject Plaintiff's argument that it is injured because its voter registration drives will not be as effective or efficient. (*Id.*) "Even if [the law] makes it more difficult for [Plaintiff] to achieve its mission—which is far from obvious—that is not the kind of impediment *Alliance* requires." (*Id.* (quoting *Deep S. Ctr. for Env't Just.*, 138 F.4th at 319).) Finally, Defendants argue that the threat of criminal enforcement is insubstantial and would be done by district attorneys, not Defendants. (*Id.*)

b. Applicable Law

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue' . . . ." *Murthy*, 603 U.S. at 57 (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *accord Dep't of Com. v. New York*, 588 U.S. 752 (2019). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted)). "These requirements help ensure that the plaintiff has 'such a personal

stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Id.* at 58. (first alteration by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The plaintiff "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)).

Additionally, "standing is not dispensed in gross." *Murthy*, 603 U.S. at 61 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Plaintiff organizations can establish standing by showing they can sue on behalf of their members (associational standing) or in their own right (organizational standing). *La Union del Pueblo Entero v. Abbott*, 187 F.4th 690, 696 (5th Cir. 2026).

Associational standing allows an organization to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Wa. State Apple Advert. Comm'n*, 432 U.S. at 343. Because the organization's members should otherwise have

standing to sue in their own right, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* at 342 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). The relief sought, such as a declaration, injunction, or other form of prospective relief, also must be for "the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.

In *Hancock County Board of Supervisors v. Ruhr*, local branches of the NAACP brought suit against Mississippi officials alleging that "the county's supervisor districts violated the Fourteenth Amendment's 'one person, one vote' guarantee." *Ruhr*, 487 F. App'x at 192. They sought declaratory and injunctive relief. *Id.* The district court dismissed the various complaints for lack of standing, but the Fifth Circuit vacated this order. *Id.*

In its discussion, the Fifth Circuit quoted the *Lujan* factors and then stated, "'[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* at 195 (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted); and citing *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009) ("At the pleading stage, allegations of injury are liberally construed.")).

As to the NAACP's standing, the Fifth Circuit easily dispensed with the second and third elements of associational standing, explaining:

> Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission. Furthermore, adjudicating a "one person, one vote" claim does not demand factual development about any individual NAACP member; no factual inquiry is necessary beyond the fact that the member is a voter in an overpopulated, under-represented district. Likewise, to determine whether to grant the requested relief of delaying election deadlines and elections, the district court would not need individualized information about NAACP members.

*Id.* at 197–98 (citations omitted).

Defendants in that case complained that the NAACP branches did not adequately allege an injury-in-fact on behalf of their members. *Id.* at 198. Defendants specifically argued that "no complaint identified, by name, any member of the local NAACP branch who was a voter from an overpopulated, under-represented district and who thereby suffered a 'one person, one vote' injury." *Id.* Defendants urged:

> [A] complaint cannot be said to allege a concrete, particularized injury without setting forth the name of an NAACP member who was allegedly injured; an NAACP branch may not establish associational standing by asserting, in the abstract, that some of its members reside in overpopulated, under-represented districts. In other words, according to appellees, the NAACP branches must name names.

*Id.* The Fifth Circuit rejected this argument, explaining:

> Yet appellees offer no authority for the proposition that an NAACP branch must identify a particular NAACP member *at the pleading stage.*[6] We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing. *Cf. Church of Scientology v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981) ("[I]n determining whether an association has standing to bring suit on behalf of its members, neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites."). Additionally, the NAACP branches were not merely alleging that some members *might* suffer a "one person, one vote" violation. The NAACP branches were alleging that some members *were* suffering such a violation. By alleging that some of its members were voters from overpopulated and under-represented districts, the NAACP branches adequately alleged that some of its members were suffering a concrete, particularized injury. We conclude that each NAACP branch adequately pleaded the elements of associational standing.

*Id.* at 198–99. The Fifth Circuit concluded, "Overall, we hold that the NAACP plaintiffs and any individual plaintiff who is alleged to be a voter in an overpopulated, under-represented district has

[6] The Fifth Circuit has required a plaintiff organization to identify a particular member by name after the pleading stage. *See La Union del Pueblo Entero v. Abbott*, 187 F.4th 690, 696–97 (5th Cir. 2026). On appeal the Fifth Circuit held that plaintiff organization did not have associational standing because they named only one member who was injured. *Id.* Further, the record did not support that the member suffered a substantial risk of future injury. *Id.*

adequately alleged facts supporting standing. We disagree with those portions of the district court orders dismissing the complaints for lack of standing." *Id.* at 199.

In a limited set of circumstances, organizations can "sue on their own behalf for injuries they have sustained." *Deep S. Ctr. for Env't Just.*, 138 F.4th at 317 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). In such cases, organizational plaintiffs "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *All. for Hippocratic Med.*, 602 U.S. at 393–94 (citing *Havens*, 455 U.S. at 378–79). "Like an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State*, 454 U.S. 464, 486 (1982)). "A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens*, 455 U.S. at 379).

*Alliance* significantly clarified the doctrine of organizational standing. In that case, the Alliance for Hippocratic Medicine and other pro-life medical associations claimed standing under *Havens* to challenge an FDA action because they "incurr[ed] costs to oppose FDA's actions" and expended "considerable resources to the detriment of other spending priorities." *Id.* at 394–95 (quotation omitted). The Supreme Court unanimously found that injury insufficient: An organizational plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394; *see also Clapper*, 568 U.S. at 417–18 (holding "self-inflicted" injuries do not confer standing).

A recent Fifth Circuit case further clarified, and narrowed, the limited circumstances in which an organization can establish organizational standing. *La Union del Pueblo Entero*, 187 F.4th at 697–98. The plaintiffs, three voting rights advocacy groups, challenged a Texas law that

required voters who vote by mail to provide an identification number that matched the State's records. *Id.* at 695–96. Plaintiffs claimed organizational standing because they suffered injury from having to "scale back their pre-existing efforts [with voter education and assistance] to focus volunteers and resources on helping voters understand and attempt to comply with the new requirement." *Id.* at 695. The Fifth Circuit rejected the argument that diversion of resources was a cognizable injury, citing *Alliance for Hippocratic Medicine*, 602 U.S. at 395. *Id.* ("[T]he Supreme Court held than an organization's diversion of resources in response to a defendant's actions cannot confer standing.").

The Fifth Circuit does not recognize mission frustration as a cognizable injury. *Deep S. Ctr. for Env't Just.*, 138 F.4th at 318. "Only in the rarest cases can organizations demonstrate standing by showing a defendant's action interferes with their activities." *Id.* The organization's ability to pursue its mission must be perceptibly impaired because it has diverted significant resources to counteract the defendant's conduct. *Id.*; *Tenth St. Residential Ass'n City of Dall.*, 968 F.3d 492, 500 (5th Cir. 2020). In *Deep South Center for Environmental Justice*, three environmental organizations challenged an EPA decision to grant Louisiana primary enforcement authority over Class VI carbon sequestration wells. *Deep S. Ctr. for Env't Just.*, 138 F.4th 310 at 316. Plaintiffs argued they had standing because they would have to "remove staffing, resources, and time from climate equity, energy efficiency, and renewable energy programming to fight the [Class VI] buildout in Louisiana." *Id.* at 318. Plaintiffs also alleged that they "redirected resources to conducting research, preparing comments, lobbying EPA to disapprove the project, and creating an education campaign opposing Louisiana's application" for the primary enforcement authority. *Id.* The Fifth Circuit, again citing *Alliance for Hippocratic Medicine*, rejected these arguments. *Id.* "Even though Deep South's staff has dedicated approximately 850 hours to education and

advocacy, that claimed injury embodies the exact 'expansive theory of standing' that *Alliance* rejected." *Id.* (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). Plaintiffs' "opposition to EPA's action, no matter how intense, amounts to 'a setback to [its] abstract social interests,' which has never sufficed to confer standing." *Id.* (quoting *Havens*, 455 U.S. at 379).

*La Union del Pueblo Entero* also foreclosed the argument that the threat of prosecution is traceable to local election officials or the Secretary of State. *La Union del Pueblo Entero*, 187 F.4th at 698. "Local prosecutors—not local election officials—are 'charged with enforcement of the criminal prohibition[s]' in the Election Code." *Id.* (quoting *Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022)). The court went on to explain

> [t]he Secretary "is not empowered to institute criminal or civil prosecutions under these statutes." *La Union del Pueblo Entero v. Nelson*, 163 F.4th 239, 263 (5th Cir. 2025). She may "refer suspected criminal conduct to the Attorney General," but the Attorney General has "no independent authority to prosecute election-related criminal offenses." *Id.* at 264 (quotation omitted). Obviously, the Secretary cannot "enforce" a criminal provision by referring conduct to another official who also cannot enforce the criminal provision. *See ibid.* . . . [T]he Secretary cannot be sued simply because the plaintiffs want a court to rewrite the [] Election Code.

*Id.*

c. Analysis

The Court finds that Plaintiff has not adequately alleged associational standing. Construing the *Complaint*'s allegations "liberally" as the Court is required to do at the pleading stage, *Ruhr*, 487 F. App'x at 195 (quoting *Little*, 575 F.3d at 540), the Court finds that these allegations do not satisfy the three requirements for associational standing. As in *Ruhr*, Plaintiff easily meets the second and third prerequisites. The interests Plaintiff seeks to protect are clearly germane to the organization's purpose, as Plaintiff alleges that it is "dedicated to advancing the right to vote, both as a matter of justice and as an expression of its religious faith" because "[v]oting holds special significance in the Jewish faith." (Doc. 1 at ¶ 15.) *Ruhr*, 487 F. App'x at 197–98; *La. St. Conf. of*

*Nat'l Assoc. for Advancement of Colored People v. Louisiana*, 490 F. Supp. 3d 982, 1012–13 (M.D. La. 2020) (deGravelles, J.). Further, the relief sought (a declaration that Act 500 violates the First and Fourteenth Amendments and an injunction to stop Defendants from enforcing Act 500) does not require the participation of individual members of Plaintiff's organization.

However, Plaintiff has not alleged that any of its members have suffered injury because of Act 500. Plaintiff alleges multiple times over that its members *will* be injured *if* forced to provide proof of citizenship, but Plaintiff also acknowledges that "as of the date of this filing, Louisiana still does not communicate any proof-of-citizenship requirement to prospective voters in any official documents or when accepting voter registration applications." (Doc. 1 at ¶ 93.) Plaintiff only points to one example of an applicant having to provide proof of citizenship—Lafayette Parish's request for "United States passport, naturalization paper, or [] birth certificate if [the applicant was] born abroad." (*Id.* at ¶ 102.) Plaintiff does not allege that it has any members in Lafayette Parish who would have been subjected to that practice. Therefore, Plaintiff had not plead that is has any members who suffered injury because of Act 500's vagueness. Nor has Plaintiff plead that is has any members who were denied the right to vote in violation of the Materiality Provision of the Civil Rights Act of 1964. Plaintiff does not have associational standing.

The Court also finds that Plaintiff does not have organizational standing. Plaintiff's diversion of resources and threat of prosecution arguments are clearly foreclosed under Fifth Circuit precedent. *La Union del Pueblo Entero*, 187 F.4th at 697–98; *accord Alliance for Hippocratic Med.*, 602 U.S. at 395. This is also not one of the "rarest cases [where] organizations [can] demonstrate standing by showing a defendant's action interferes with their activities." *Deep S. Ctr. for Env't Just.*, 138 F.4th at 318.

Plaintiffs in *Deep South* "redirected resources to conducting research, preparing comments, lobbying EPA to disapprove the project, and creating an education campaign opposing Louisiana's application" for the primary enforcement authority. *Id.* They also "dedicated approximately 850 hours to education and advocacy," but the Fifth Circuit still held that Plaintiffs did not have organizational standing. *Id.* Plaintiff in this case has not alleged nearly the same level of diversion of resources. Plaintiff alleges that Act 500 will hinder its ability to "register voters at anywhere near the current rates" or "carry out its voter registration drive as effectively." (Doc. 1 at ¶¶ 18, 22.) But Plaintiff does not allege that it will be unable to carry out these activities entirely, only that they will not be as effective as before. If dedicating 850 hours of staff time was not enough to establish organizational standing, a general claim that operations will not be as efficient is certainly not enough to establish organizational standing. This part of Defendants' *MTD* is granted and the remaining claims are dismissed without prejudice.

### 4. *Ripeness*

a. Parties' Arguments

1. *Defendants' MTD (Doc. 98-1)*

Defendants argue Plaintiff's claims are unripe because Act 500 has been enacted but not yet implemented, pending EAC approval of an implementation plan. (Doc. 98-1 at 22–23.) As such, Defendants say the claims "are not 'fit for judicial decision,'" and "there would be no 'hardship to the parties' if the court withheld its consideration." (*Id.* at 22 (quoting *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 930 (5th Cir. 2023)).) Defendants contend that Plaintiff's "claim is contingent on a future implementation of Act 500 that may not occur," which is "the precise 'speculation' that the fitness prong should guard against." (*Id.* at 22–23 (quoting *Braidwood Mgmt., Inc.*, 70 F.4th at 930).) Defendants also argue that Plaintiff faces no hardship if the Court withholds review "because their supposed injury is entirely conjectural."

(*Id.* at 23.) Defendants believe this is a pre-enforcement challenge and any hardship "must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'" (*Id.* (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006)).)

2. *Plaintiff's Opposition (Doc. 100)*

Plaintiff asserts that its claims are ripe because they present "purely legal" issues and Defendants identify no factual contingences that could affect Act 500's lawfulness. (Doc. 100 at 22 (quoting *Lopez v. City of Hou.*, 617 F.3d 336, 341 (5th Cir. 2010)).) "Ripeness concerns [] dissipate when an action presents a 'purely legal' issue." (*Id.* (quoting *Lopez*, 617 F.3d at 341).) Plaintiff argues that even though the EAC rejected Defendants' requested changes, Defendants still plan to implement Act 500 in the manner outlined in their request. (*Id.* at 23.) Therefore, according to Plaintiff, there is no factual issue about implementation, only a question of legality. (*Id.*) Further, Plaintiff will continue to face hardship "unless Defendants do not intend to enforce [Act 500] at all." (*Id.*)

3. *Defendants' Reply (Doc. 102)*

Defendants again argue that Plaintiff's claims are based on "contingent future events that may not occur as anticipated, or indeed may not occur at all." (Doc. 102 at 6 (quoting *Roake v. Brumley*, 170 F.4th 292, 297 (5th Cir. 2026)).) If a court cannot evaluate a law's constitutionality "without resorting to conjecture," the claim is not ripe. (*Id.* (quoting *Roake*, 170 F.4th at 299).) Defendants also cite *Roake* to explain that "an unripe challenge does not become ripe merely because a party asserts that the challenged action would be unlawful on any conceivable set of facts." (*Id.* (quoting *Roake*, 170 F.4th at 299).)

b. Applicable Law

"Under Article III of the Constitution, federal courts are confined to adjudicating 'cases' and 'controversies.'" *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th Cir. 2017) (quoting *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000)). "And to be a case or controversy for Article III jurisdictional purposes, the litigation 'must be ripe for decision, meaning that it must not be premature or speculative.'" *Id.* (first quoting *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002); and then citing *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012)). *See also Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985) ("[The] basic rationale" of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))). "In other words, 'ripeness is a constitutional prerequisite to the exercise of jurisdiction.'" *Lower Colo.*, 858 F.3d at 922 (quoting *Shields*, 289 F.3d at 835).

"First, a claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Id.* (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). "So, if a claim is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe." *Id.* at 930–31 (quoting *Thomas*, 473 U.S. at 580–81 (quotation omitted)). But, "[i]ssues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003)). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581 (quoting *Blanchette v.*

*Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923))).

Second, the Court must evaluate if Plaintiff has "shown that hardship will result if court consideration is withheld at this time." *Choice Inc. of Tex.*, 691 F.3d at 715. The question is whether "the impact of the [law] upon the [Plaintiff] is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Abbott Lab'ys*, 387 U.S. at 152. "An assessment of hardship often turns on a straight-forward prediction of the course events are likely to take." 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3532.3 (3d ed. 2024). "Although it often is difficult to make secure predictions of the probable occurrence or severity of future injury in any particular case, there is nothing complicated about the process." *Id.* The Fifth Circuit "has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being force[d] . . . to modify [one's] behavior in order to avoid future adverse consequence." *Choice Inc. of Tex.*, 691 F.3d at 715 (alteration in original) (internal quotation marks omitted). A plaintiff can meet the ripeness doctrine's hardship prong by satisfying just one. *Id.*

c. Analysis

The Court finds that Plaintiff's vagueness claim is ripe. First, the Court must determine whether the case is "fit for judicial decision." *Braidwood Mgmt., Inc.*, 70 F.4th at 930 (citing *New Orleans Pub. Serv., Inc.*, 833 F.2d at 586–87). Plaintiff's vagueness challenge only requires the Court to look to the text of the statute and does not require a factual inquiry in order to determine if the issue is fit for judicial review. *Deep S. Today v. Murrill*, 779 F. Supp. 3d 782, 800 (M.D. La. 2025) (deGravelles, J.). Plaintiff is correct in arguing that Act 500 does not explain why proof of

citizenship is necessary, what proof would satisfy the law, how the proof must be submitted, whether the proof of citizenship requirement applies to all methods of registration, when the proof must be submitted, or the consequences for submitting an application without proof of citizenship. Further, when claims concern a First Amendment right, as Plaintiff's vagueness claim does, the threshold for ripeness is lowered. *Id.* (citing Wright & Miller, *supra*, at § 3532.3). Therefore, Plaintiff's vagueness claim is fit for judicial review.

Plaintiff will suffer a hardship if review is withheld because of "practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify its behavior in order to avoid future adverse consequences.'" *Choice Inc. of Tex.*, 691 F.3d at 715 (quoting *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (quoting *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998))). Plaintiff is a voting advocacy organization whose core mission is to safeguard individual rights and freedoms, consistent with Jewish values, including the right to vote. Plaintiff advances its mission by holding voter registration drives. Plaintiff asserts it cannot achieve its mission or hold successful voter registration drives because of Act 500's proof of citizenship requirement (Doc. 1 at ¶¶ 18, 22–23.). Therefore, Plaintiff faces practical harms to the interests it seeks to advance because of Act 500's proof of citizenship requirement. Plaintiff will also be forced to modify its behavior to comply with Act 500. Plaintiff expects to spend more time and money educating volunteers, members, and the community about how to register to vote under Act 500's proof of citizenship requirement. (*Id.*) Plaintiff will also need to purchase new equipment to be able to successfully register voters at their voter registration events. (*Id.* at ¶ 18.) Therefore, Plaintiff will suffer hardship if review of its vagueness claim is withheld.

However, the Court finds that Plaintiff's Civil Rights Act claim is not ripe. If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe. *Braidwood Mgmt., Inc.*, 70 F.4th at 930–31 (quoting *Thomas*, 473 U.S. at 580–81). The Materiality Provision of the Civil Rights Act

> prohibits individuals "acting under color of law" from denying anyone the right "to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."

(Doc. 1 at ¶ 204 (quoting 52 U.S.C. § 10101(a)(2)(B)).) By Plaintiff's own admission, "Louisiana still does not communicate any proof-of-citizenship requirement to prospective voters in any official documents or when accepting voter registration applications." (*Id.* at ¶ 93.) Because Louisiana has not requested proof of citizenship from any voter registration applicants, it has not "den[ied] anyone the right 'to vote'" for failure to provide proof. (*Id.* at ¶ 204 (quoting 52 U.S.C. § 10101(a)(2)(B)).) Plaintiff does say that Lafayette Parish has requested proof of citizenship, but Plaintiff does not allege that any voters have been denied the right to vote. (*Id.* at ¶ 102.) Plaintiff has not alleged any facts to support its Civil Rights Act claim. That claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Braidwood Mgmt., Inc.*, 70 F.4th at 930–31. Therefore, Plaintiff's Civil Rights Act claims is not ripe.

Defendants' *MTD* is denied as to Plaintiff's vagueness claim, Count VII. Defendants' *MTD* is granted as to Plaintiff's Civil Rights Act claim, Count VI. Count VI is dismissed without prejudice.

### ***5. Sovereign Immunity***

a. Parties' Arguments

*1. Defendants' MTD (Doc. 98-1)*

Defendant Landry argues that sovereign immunity forecloses Plaintiff's vagueness claim against her. (Doc. 98-1 at 24.)[7] Further, Defendant Landry asserts that the *Ex parte Young* exception does not apply because there is no "ongoing violation[] of federal law." (*Id.* (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022)).) If a state official has "neither enforced the challenged statute against anyone nor threatened to do so," there is no "ongoing conduct" sufficient to trigger *Ex parte Young*. (*Id.* at 24–25 (quoting *Mi Familia Vota v. Ogg*, 105 F.4th 313, 332 (5th Cir. 2024)).) Defendant Landry reads Plaintiff's allegations to fault her only for her inaction, namely her failure to provide guidance on how to implement Act 500. (*Id.* at 25.) Therefore, there is no "ongoing conduct" sufficient to trigger the *Ex parte Young* exception and she can claim sovereign immunity. (*Id.*)

*2. Plaintiff's Opposition (Doc. 100)*

Plaintiff argues that sovereign immunity does not foreclose its vagueness claim. (Doc. 100 at 24.) Plaintiff asserts that the *Ex parte Young* exception applies to this claim. (*Id.* at 25–27.) Plaintiff contends that for the exception to apply, the complaint must seek prospective relief and the defendant must have some connection with the enforcement of the challenged statute. (*Id.* at 26 (citing *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 416 (5th Cir. 2004); *Tex. All. For Retired Ams.*, 28 F.4th at 671–72).) According to Plaintiff, Defendant Landry cannot disclaim that connection of enforcement because "she is the one charged with 'direct[ing]' the registrar of voters with respect to voter registration, '[p]rescribing uniform rules, regulations, forms, and instructions,' with respect to 'forms of applications for registration,' and 'coordinat[ing]'

---

[7] Defendants also claimed that sovereign immunity foreclosed Plaintiffs' NVRA claims against Defendant Landry and the State Defendants. The Court does not address this argument, or Plaintiffs' reply, because the NVRA claims were dismissed for failure to provide sufficient notice under the NVRA.

Louisiana's NVRA responsibilities." (*Id.* (quoting La. R.S. §§ 18:18(A)(2)–(3), 18:18(A)(6), 18:58(A)). Further, Defendant Landry is the one who would provide guidance for implementing Act 500, if guidance were to be provided. (*Id.* at 26–27.). Finally, Plaintiff claims that inaction can be the basis for an ongoing violation of federal law so the *Ex parte Young* exception applies. (*Id.* (citing *Lavandeira v. Tampa Police Dep't*, No. 20-169, 2021 WL 1541716, at *6 (M.D. Fla. Apr. 20, 2021); *Gautreaux v. Masters*, No. 21-1166, 2022 WL 3723298, at *6 (W.D. Tex. Aug. 29, 2022) ("A violation can be considered ongoing . . . based on action or inaction of officials.")).) "Immunity does not shield the Secretary here." (*Id.* at 27.)

*3. Defendants' Reply (Doc. 102)*

Defendant Landry reasserts the argument that "there is no ongoing conduct sufficient to trigger" the *Ex parte Young* exception. (Doc. 102 at 8.) Defendant rejects Plaintiff's argument that it is enough that Defendant Landry "would provide guidance [on Act 500] if guidance were to be provided." (*Id.* (quoting Doc. 100 at 27).) Therefore, there is no ongoing or imminent enforcement so the *Ex parte Young* exception does not apply and sovereign immunity should bar Plaintiff's claim. (*Id.*)

b. Applicable Law

"Under the Eleventh Amendment, '[f]ederal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it.'" *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025) (quoting *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014)); *accord Book People, Inc. v. Wong*, 91 F.4th 318, 334 (5th Cir. 2024). But under the *Ex parte Young* exception, "a plaintiff can seek prospective injunctive relief 'against individual state officials acting in violation of federal law.'" *Book People*, 91 F.4th at 334 (quoting

*City of Aus. v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (identifying "three criteria" for the exception).

In order for a state official to be a proper defendant pursuant to *Ex parte Young*, that official "'must have some connection with the enforcement of' the law being challenged." *Mi Familia Vota*, 105 F.4th at 325 (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). There are three "guideposts" that aid courts in making this determination. *Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). These are:

> (1) the state official has "more than the general duty to see that the laws of the state are implemented," *i.e.*, a "particular duty to enforce the statute in question"; (2) the state official has "a demonstrated willingness to exercise that duty"; and (3) the state official, through her conduct, "compel[s] or constrain[s persons] to obey the challenged law."

*Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672); *see also id.* at 325 n.7.

The above analysis is "provision-by-provision." *Id.* at 327. That is, the state official "must enforce 'the particular statutory provision that is the subject of the litigation.'" *Id.* (quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672). The Fifth Circuit has "defined 'enforcement' as 'typically involv[ing] compulsion or constraint,'" so if the state official "does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (first quoting *City of Aus.*, 943 F.3d at 1000; and then quoting *Tex. All. for Retired Ams.*, 28 F.4th at 672).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Book People*, 91 F.4th at 335 (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)). "[D]irect enforcement . . . is not required." *Healthy Vision Ass'n*, 138 F.4th at 396 (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir.

2017)); *see also Mi Familia Vota*, 105 F.4th at 329 (requiring "'some scintilla' of affirmative action" demonstrating a state official's willingness to enforce the relevant statute). Lastly, the Fifth Circuit has often observed that "Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the [state] official under the *Ex parte Young* exception." *Book People*, 91 F.4th at 335 (cleaned up).

c. Analysis

The Court must determine whether Plaintiff's vagueness claim, brought under 42 U.S.C. § 1983, against the Secretary of State in her official capacity is barred by the Eleventh Amendment. It is undisputed and clear from Plaintiff's *Complaint* that it is seeking prospective declaratory and injunctive relief for an ongoing violation of Plaintiff's rights under the First and Fourteenth Amendments. (Doc. 1 at 41–43.) Thus, the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity is implicated so long as Secretary of State Landry is a proper defendant and there is an adequate connection between her and the enforcement of Act 500, enacted as Louisiana Revised Statutes § 18:104(D).

First, the Court will look to the text of Louisiana Revised Statutes § 18:104 itself to determine whether Secretary of State Landry is the proper defendant in this matter. *See Book People, Inc.*, 91 F.4th at 335. The Louisiana Supreme Court has laid out the following guidelines for interpreting statutes:

> Legislation is the solemn expression of the legislative will; thus, the interpretation of legislation is primarily the search for the legislative intent. *Cat's Meow, Inc. v. City of New Orleans*, 98–0601 [ ] (La. 10/20/98)[;] 720 So. 2d 1186, 1198; *La. Safety Ass'n of Timbermen Self–Insurers Fund v. La. Ins. Guar. Ass'n*, 09–0023 [ ] (La. 6/26/09)[;] 17 So. 3d 350, 355–56. *See also* La. R.S. [§] 24:177(B)(1). When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. R.S. [§] 1:4. The starting point for interpretation

> of any statute is the language of the statute itself. *See, e.g., Cat's Meow*, [ ] 720 So. 2d at 1198; *Timbermen*, [ ]17 So. 3d at 356. Additionally, "all laws pertaining to the same subject matter must be interpreted in *pari materia*, or in reference to each other." *See, e.g., State v. Williams*, 10–1514 (La. 3/15/11)[;] 60 So. 3d 1189, 1191; La. [Civ. Code] art. 13. When, on the other hand, a statute is not clear and unambiguous, or its application leads to absurd consequences, we rely on secondary rules of statutory interpretation to discern the meaning of the statute at issue. *See Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.*, 10–0193 [ ] (La. 1/19/11)[;] 56 So. 3d 181, 187–88 (quotation omitted). In such cases, the statute "must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." *Id.*

*Pierce Founds., Inc. v. Jaroy Const., Inc.*, 2015-0785 (La. 5/3/16), 190 So. 3d 298, 303.

Considering these guidelines, the Court finds that the Louisiana Legislature tasked the Secretary of State with enforcement of Louisiana Revised Statutes § 18:104(D). The statute says, "The secretary of state, subject to approval by the attorney general as to content, shall prescribe the form that shall be used uniformly by each registrar in the state and any person authorized to accept voter registration applications in registering qualified citizens to vote." La. R.S. § 18:104(A). Thus, because the Secretary of State is statutorily tasked with prescribing the form used for voter registration, Defendant Landry is a proper defendant.

Further, the Court finds that Defendant Landry is a proper defendant because she has the authority to enforce Louisiana Revised Statutes § 18:104(D). *See City of Aus.*, 943 F.3d at 998 ("Where no state official or agency is named in the statute in question, we consider whether the state official actually has the authority to enforce the challenged law."). The Secretary of State's powers and duties under Louisiana's Election Code include "administer[ing] the laws relating to . . . voter registration, and for this purpose [s]he shall . . . [d]irect and assist the registrars of voters of the state with respect to matters pertaining to the registration of voters as provided by law . . . ." La. R.S. § 18:18(A)(2). Administering voter registration laws and "direct[ing]" local registrars

"with respect to" matters relating to Louisiana's voter registration weigh heavily in favor of the Secretary of State having statutory authority to enforce voter registration laws such as Louisiana Revised Statutes § 18:177(A)(1). As such, the Court finds that Louisiana's Secretary of State is a proper defendant in this matter and must next determine whether there is a sufficient connection between the Secretary of State and the actual enforcement of Louisiana Revised Statutes § 18:104(D).

It is clear from the specific actions taken by the Secretary of State that at the very least there is a scintilla of enforcement between the Secretary of State and Louisiana Revised Statutes § 18:104(D). By Defendant's own admission she "began her implementation by submitting a request to the EAC . . . asking that the Federal Form's Louisiana-specific instructions be amended to reflect Act 500's proof-of-citizenship requirement." (Doc. 98-1 at 10.) But Defendant did more than simply submit one request to the EAC. The initial submission on January 30, 2025 included two options for amending the instructions. (*Id.* at 11.) Defendant again contacted the EAC on May 17, 2025, asking the EAC to pause review so Louisiana could "provide additional materials." (*Id.*) While that communication paused part of the enforcement process—the EAC review—it demonstrates that enforcement work was still happening behind the scenes as Defendant Landry worked to gather evidence to support the enforcement of Act 500. Defendant unquestionably restarted the enforcement in June 2025, when Louisiana asked the EAC to resume its review. (*Id.*) The EAC rejected Defendant's requested revisions in September 2025. (*Id.* at 12.) Defendant could have stopped enforcement then but instead renewed the request to the EAC citing new information. (*Id.* at 12–13.) Defendant's numerous communications with the EAC and behind-the-scenes work to research and justify the need for Act 500 are enforcement actions sufficient to trigger the *Ex parte Young* exception. Sovereign immunity does not foreclose Plaintiff's vagueness claim.

For these reasons, the Court finds that Defendant Landry has a sufficient connection to Louisiana Revised Statutes § 18:104(D), and thus the *Ex parte Young* exception to the Eleventh Amendment's sovereign immunity applies. Therefore, Defendants' *MTD* with respect to this issue is denied.

## IV. Leave to Amend

"Federal Rule of Civil Procedure 15(a) requires the trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.'" *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (quoting *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1162 (5th Cir. 1982)). "[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1995). In *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, the court said:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

313 F.3d 305, 329 (5th Cir. 2002). Further:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in

> unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

*JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 642 (M.D. La. 2018) (deGravelles, J.) (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016)).

Thus, the Court will, in accordance with wise judicial practice, allow Plaintiff leave to amend its *Complaint* to cure the above deficiencies, if it can do so. *See Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing, *inter alia*, *Fetty v. La. State Bd. of Private Sec. Exam'rs*, 611 F. Supp. 3d 230, 250 (M.D. La. 2020) (deGravelles, J.)). However, Plaintiff's counsel is reminded of their obligations under Federal Rule of Civil Procedure 11(b).

## V. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' *Motion to Dismiss Plaintiff's Complaint* (Doc. 98) is **GRANTED IN PART** and **DENIED IN PART**. With respect to Plaintiff's NVRA claims—namely Defendants' arguments as to Plaintiff's NVRA notice—the *Motion to Dismiss* is **GRANTED**, and Plaintiff's NVRA claims are **DISMISSED WITHOUT PREJUDICE.** Defendants' *Motion to Dismiss* Plaintiff's Civil Rights Act claim and vagueness claim for lack of standing is also **GRANTED**, and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**. Defendants' *Motion to Dismiss* Plaintiff's Civil Rights Act claim, because it is unripe, is also **GRANTED**. In all other respects, the *Motion to Dismiss* is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff shall have one hundred thirty-two (132)[8] days from the Court's ruling on Defendants' *Motion to Dismiss Plaintiff's Complaint* (Doc. 98) in which

[8] One hundred thirty-two (132) days allows Plaintiffs fourteen (14) days to send Defendants a new NVRA notice letter, wait the required ninety (90) days, and then file an amended complaint within twenty-eight (28) days.

to cure the above deficiencies regarding their NVRA claims and Civil Rights Act claims if same can, in good faith, be cured. If Plaintiff fails to do so, all remaining deficient claims will be dismissed with prejudice.

Signed in Baton Rouge, Louisiana, on November 2, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**